[No. 9724–5–I.   Division One.   May 25, 1983.]

DEANNA WHITE, ET AL, *Appellants,* v. GLEN WILHELM, ET AL, *Respondents.*

*Francis, Lopez & Ackerman* and *Peter D. Francis,* for appellants.

*Bogle & Gates* and *Helen Harvey,* for respondents.

CALLOW, J.—Deanna White and the marital community of Robert and Marlyce Dixon, appeal a judgment denying them injunctive relief and/or damages for the alleged violation of certain residential restrictive covenants by the marital community of Glen and Carol Wilhelm. The Wilhelms cross–appeal the judgment of the trial court denying them attorney's fees for damages in defense of this action. Three

issues are presented:

1. Whether substantial evidence supports the trial court's finding that the purpose of the restrictive covenants was to obtain FHA financing;

2. Whether the construction of a swimming pool enclosure by the Wilhelms is in violation of the Malabar Hill covenants, thereby requiring a permanent injunction of the construction;

3. Whether the Wilhelms should be granted attorney's fees for damages incurred as a result of their defense of this action.

The parties to the instant action, Deanna White, Robert B. Dixon, Marlyce Dixon, Glen Wilhelm, and Carol Wilhelm all reside adjacent to each other in a subdivision in King County known as Malabar Hill Division 1. In 1962, Don Jacobs and Robert Yelland, the developers of the subdivision, filed an instrument containing residential area covenants (Malabar Hill covenants) when subdividing the property for residential construction. There is no dispute that the parties are subject to these covenants.

The Malabar Hill covenants generally restrict land use, building type, architectural style, cost, quality, size, location, and access to homes built within the subdivision. They further provide that building plans, specifications, architectural style, and other specified items must be approved by the Architectural Control Committee (Committee) prior to construction. The Committee was originally comprised of Don Jacobs and Robert Yelland, the developers, and Allen Hill, a consulting engineer, but has not functioned for the past several years.

This dispute arose in August of 1980 when the Wilhelms began construction of an enclosure for their swimming pool so that it could be used year round. The Wilhelms had installed and completed the pool in February of 1980 in response to a doctor's recommendation that Carol Wilhelm swim on a regular basis as treatment for her rheumatoid arthritis. The pool is located immediately adjacent to the Wilhelms' house, and there is no contention that the swim-

ming pool, by itself, is in violation of the restrictive covenants.

However, when construction of the pool enclosure continued over the objection of White and the Dixons, they filed this lawsuit seeking an injunction and/or damages. On September 25, 1980, the Wilhelms were served with a temporary restraining order and order to show cause enjoining them from further construction of the pool enclosure. They immediately ceased construction of the pool enclosure. At the time of trial, the Wilhelms had spent approximately $14,000 for the cost of the enclosure and expected to spend another $8,500–$9,000 to complete the addition.

Following trial, the trial court entered judgment denying White's and the Dixons' request for injunctive relief, damages, and attorney's fees and dismissed the action. The trial court further denied the Wilhelms' counterclaim for attorney's fees as damages for defending the action.

The first issue is whether substantial evidence supports the finding that the purpose of the restrictive covenants was to obtain financing.

Initially, White and the Dixons challenge the trial court's finding of fact that:

> The restrictive covenants on Malabar Hill Division No. 1 (Exhibit 1) were drawn up in the early 1960's for the purpose of qualifying homes within the development for FHA financing.

The finding is supported by substantial evidence and will not be disturbed on appeal. *Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 199, 570 P.2d 1035 (1977); *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

In any event, the finding was not material to the decision of the trial court and its entry not grounds for reversal. *See State v. Craig,* 82 Wn.2d 777, 784, 514 P.2d 151 (1973); *W.L. Reid Co. v. M–B Contracting Co.,* 46 Wn.2d 784, 791, 285 P.2d 121 (1955); *James S. Black & Co. v. P & R Co.,* 12 Wn. App. 533, 537, 530 P.2d 722 (1975); *Stuart v. Consolidated Foods Corp.,* 6 Wn. App. 841, 845,

496 P.2d 527 (1972).

The second issue is whether the construction of a swimming pool enclosure by the Wilhelms is in violation of the Malabar Hill covenants, thereby requiring a permanent injunction of such construction.

*Burton v. Douglas Cy.,* 65 Wn.2d 619, 621–22, 399 P.2d 68 (1965) stated the recognized principles for construing restrictive covenants:

> (1) The primary objective is to determine the intent of the parties to the agreement, and, in determining intent, clear and unambiguous language will be given its manifest meaning. (2) Restrictions, being in derogation of the common–law right to use land for all lawful purposes, will not be extended by implication to include any use not clearly expressed. Doubts must be resolved in favor of the free use of land. (3) The instrument must be considered in its entirety, and surrounding circumstances are to be taken into consideration when the meaning is doubtful.

(Citations omitted.)

White and the Dixons contend by construction of their swimming pool enclosure that the Wilhelms are in direct violation of three specific provisions of the Malabar Hill covenants, to wit, sections III A, III B, and III D. We turn to a discussion of these covenants.

First, White and the Dixons contend that the Wilhelms have violated section III A of the Malabar Hill covenants, since the construction of the swimming pool enclosure creates a second building separate and distinct from the existing dwelling and is not merely an addition to the Wilhelms' home.

Section III A states:

> No lot shall be used except for residential purposes. No building shall be erected, altered, placed, or permitted to remain on any lot other than one detached single–family dwelling not to exceed two and one–half stories in height and a private garage for not more than four cars.

The trial court found that "the defendants' enclosed swimming pool is not a separate building but is an addition

to their single–family dwelling." The definition of what constitutes a "single–family dwelling" and whether a structure constructed adjacent to such a dwelling is a component thereof or whether it is a separate "building" is to some extent a legal, not a factual issue. Nonetheless, "[f]indings of fact that are actually conclusions of law will be treated as such," and are subject to appellate review. *Artz v. O'Bannon,* 17 Wn. App. 421, 425, 562 P.2d 674 (1977); *see Woodruff v. McClellan,* 95 Wn.2d 394, 396, 622 P.2d 1268 (1980).

Generally, a restrictive covenant which limits a lot to "one single–family dwelling" prohibits an owner from building more than one residential structure on the lot and from using that structure to house more than one family. *Collins v. Goetsch,* 59 Hawaii 481, 583 P.2d 353 (1978); *see* 20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 196 (1965). What constitutes a "building" has been traditionally defined "as a structure or edifice enclosing a space within its walls, and usually covered with a roof", Annot., *What Constitutes a "Building" Within Restrictive Covenant,* 18 A.L.R.3d 850, 852 (1968), but "whether a particular structure is a building in violation of a restriction depends upon the wording of the restriction, strictly construed, under the facts of the particular case." 20 Am. Jur. 2d, *supra* at § 194. However, where an addition to a home is not separate and distinct so that it has the appearance of a separate building, it will not violate a restrictive covenant against building more than one structure on a lot. *Tate v. Moran,* 264 Pa. Super. 540, 400 A.2d 217, 220 (1979); *see Shapiro v. Levin,* 223 Pa. Super. 535, 302 A.2d 417 (1973).

The record supports the conclusion that the enclosure is an addition to the Wilhelms' home and is not a separate building. The enclosure is to be sided with cedar drop siding similar to the house, with windows, doors, and trim similar to the house. It will be the same color as the house. It is a part of the house and is not separate. The Wilhelms felt the enclosure was an addition to their home and filed the application for the building permit based on that belief. The enclosure is entered through the Wilhelms' recrea-

tional room, and the enclosure and recreational room are adjoining rooms like any other room in the house. There is no separation between the house and pool enclosure. Since the swimming pool enclosure was built as a part of the house and not as a separate structure distinct from the Wilhelms' home, its construction is not in violation of section III A of the Malabar Hill covenants.

Second, White and the Dixons contend that the Wilhelms violated section III B of the Malabar Hill covenants by not getting approval of the swimming pool enclosure by the Committee prior to construction. Section III B states in part:

> No building shall be erected, placed, or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee as to the quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation. No fence or wall shall be erected, placed or altered on any lot nearer to any street than the minimum building setback line unless similarly approved.

■ There is no dispute that the Wilhelms did not get approval of the Committee prior to construction. However, "[i]f a covenant which applies to an entire tract has been habitually and substantially violated so as to create an impression that it has been abandoned, equity will not enforce the covenant." *Sandy Point Imp. Co. v. Huber,* 26 Wn. App. 317, 319, 613 P.2d 160 (1980); *see Reading v. Keller,* 67 Wn.2d 86, 90, 406 P.2d 634 (1965).

> In subdivision cases, where the "common plan" has broken down due to substantial unchecked prior violations of the restrictions within the subdivision, the covenants may be deemed to have been terminated by abandonment. *See e.g. Mount Baker Park Club v. Colcock,* 45 Wn.2d 467, 275 P.2d 733 (1954); *St. Lukes v. Hale's,* 13 Wn. App. 483, 534 P.2d 1379 (1975); 5 POWELL ON REAL PROPERTY ¶. 683 (1977). A few violations will not suffice to constitute an abandonment, the plan must

have been "habitually and substantially violated." *Mount Baker Park Club v. Colcock, supra.*

Washington State Bar Ass'n, *Real Property Deskbook* § 15.21 (1979). Applicability of this doctrine, which is based on estoppel, is a factual determination. *Sandy Point Imp. Co. v. Huber, supra; Bersos v. Cape George Colony Club,* 4 Wn. App. 663, 484 P.2d 485 (1971).

Further, "one who has violated a building restriction cannot enforce a building restriction against others." *Reading v. Keller, supra* at 89.

> [W]here a restriction has been violated by a substantial number of property owners other than the defendant, and especially where the plaintiff himself is one of the violators, a mandatory injunction requiring removal of the offending structure will not be granted.

(Footnotes omitted.) 20 Am. Jur. 2d, *supra* at § 331.

> As for the misconduct of the plaintiff, we note that there was evidence at trial tending to show that the requirement of prior approval of building plans had been habitually and substantially violated over a long period of time. The nonenforcement of these provisions diminishes the meritoriousness of the conduct of the plaintiffs in charging [the defendant] with violation of these restrictions.

*Lenhoff v. Birch Bay Real Estate, Inc.,* 22 Wn. App. 70, 76, 587 P.2d 1087 (1978).

■ The trial court made the following findings:

3. There has been no Architectural Control Committee in existence for several years.

4. There have been numerous violations of the restrictive covenants in Malabar Hill Division No. 1. Three houses have been built on lots 3, 5, and 17 without approval of the Architectural Control Committee as is required by III.B. of the covenants.

5. The plaintiffs are not in a position to obtain equitable relief from the court such as that for which they are asking. Plaintiffs Dixon's house (lot number 17) was built without approval of the Architectural Control Committee by their predecessors, the former owners of the house. Plaintiff White's violations of the covenants include:

a. Alteration of the house deck without approval of the Architectural Control Committee;

b. Addition of a storage shed with a white aluminum corrugated roof on the south side of plaintiff White's house without approval of the Architectural Control Committee, and within five feet to the side line (which is in violation of the King County Code) . . .

These findings are supported by substantial evidence and will not be disturbed on appeal. *Seattle–First Nat'l Bank v. Brommers, supra; Thorndike v. Hesperian Orchards, Inc., supra.* These findings support the trial court's conclusion that:

There is no Architectural Control Committee in existence, the plaintiffs or predecessors have been in violation of III.B. of the covenants by not getting approval of the . . . Committee, and Section III.B. has been violated in the division over several years. The fact that the defendants did not try to submit their plans to a non-existent . . . Committee provides no legal cause of action to the plaintiffs.

Third, White and the Dixons contend that the Wilhelms have violated section III D because the pool enclosure is closer than 15 feet to the rear line of the Wilhelms' lot which they allege is an interior lot. Section III D states in part:

No dwelling shall be located on any interior lot nearer than fifteen feet to the rear lot line.

██ ██ This language is ambiguous. "'A written instrument is ambiguous when its terms are uncertain or capable of being understood as having more than one meaning.'" *Rydman v. Martinolich Shipbuilding Corp.,* 13 Wn. App. 150, 153, 534 P.2d 62 (1975) (quoting *Murray v. Western Pac. Ins. Co.,* 2 Wn. App. 985, 989, 472 P.2d 611 (1970)). It is unclear whether an "interior lot" includes the Wilhelms' lot which is only partially surrounded by adjoining lots or whether it includes only those lots completely encompassed by other lots in the subdivision. Therefore, the trial court could properly consider additional testimony in determin-

ing the intent of the parties.

"Ambiguous intent is to be clarified by reference to the instrument, together with all surrounding facts and circumstances." *Foster v. Nehls,* 15 Wn. App. 749, 751, 551 P.2d 768 (1976). "Such 'surrounding circumstances' as may be considered are only those which tend to reflect the intent of the drafters; circumstances extant at the time the covenant is sought to be enforced are irrelevant to the question of ambiguity." *Lenhoff v. Birch Bay Real Estate, Inc., supra* at 73. Intent is a question of fact to be discovered by reference to the instrument in its entirety and the manifest meaning of the language used by the parties. *Fairwood Greens Homeowners Ass'n v. Young,* 26 Wn. App. 758, 761, 614 P.2d 219 (1980); *Foster v. Nehls, supra; Bersos v. Cape George Colony Club, supra.* Here, Robert Yelland, one of the original developers of the subdivision who was involved in preparing the Malabar Hill covenants testified that he did not know exactly what the word "interior lot" meant as used in the covenants. "[R]estrictions on the free use of land will not be implied unless they necessarily follow from clear language of written restrictions." *Bersos v. Cape George Colony Club, supra* at 666; *see Weld v. Bjork,* 75 Wn.2d 410, 451 P.2d 675 (1969).

The trial court concluded:

It has not been clearly established that the defendant's lot number 19 is an interior lot, thus bringing into play . . . III.D(2). It appears to be an exterior lot or perhaps it is ambiguous, and doubts about restrictions should be resolved in favor of the free use of land.

We agree:

A restrictive covenant is to be strictly construed. *Miller v. American Unitarian Ass'n,* 100 Wash. 555, 171 Pac. 520; *Granger v. Boulls,* 21 Wn. (2d) 597, 152 P. (2d) 325, 155 A. L. R. 523. Public policy favors the free use of one's own land. Imposed restrictions will not be aided or extended by judicial construction, and doubts will be resolved in favor of the unrestricted use of property.

*Gwinn v. Cleaver,* 56 Wn.2d 612, 615, 354 P.2d 913 (1960); *see Fairwood Greens Homeowners Ass'n; Sandy Point Imp.*

*Co. v. Huber, supra; Burton v. Douglas Cy.,* 65 Wn.2d 619, 399 P.2d 68 (1965). Moreover, a defendant cannot be held to strict compliance with an uncertain prohibition. *Holmes Harbor Water Co. v. Page,* 8 Wn. App. 600, 604, 508 P.2d 628 (1973). The trial court did not err in refusing to subject the Wilhelms' lot to the restriction regarding "interior" lots.

The denial of injunctive relief and/or damages was proper since the Malabar Hill covenants have not been violated or, if violated, have been abandoned or waived.

> It is a well settled rule that one who seeks relief of either a temporary or permanent injunction must establish (1) that he has a clear legal or equitable right, (2) that he has a well grounded fear of immediate invasion of that right by the one against whom the injunction is sought, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him. *Port of Seattle v. International Longshoremen's & Warehousemen's Union,* 52 Wn.2d 317, 324 P.2d 1099 (1958); . . .

*Hendricks v. Lake,* 12 Wn. App. 15, 19, 528 P.2d 491 (1974); *see Tyler Pipe Indus., Inc. v. Department of Rev.,* 96 Wn.2d 785, 792, 638 P.2d 1213 (1982); RCW 7.40.020. The plaintiffs have not established a clear equitable or legal basis which would warrant a mandatory injunction or allow for damages.

The third issue is whether the Wilhelms should be granted attorney's fees for damages incurred as a result of their defense of this action.

The Wilhelms have cross–appealed alleging that the trial court erred in denying them attorney's fees and costs. They contend that attorney's fees are damages recoverable by a party who successfully resists a wrongful injunction.

Attorney's fees will not be awarded in the absence of a contract, statute or recognized ground of equity. *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 540, 585 P.2d 71 (1978); *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 176, 570 P.2d 428, 97 A.L.R.3d 482 (1977). However, "[a]s a general rule, attorney's fees are damages recoverable by the

party who successfully resists a wrongful injunction." *Parsons Supply, Inc. v. Smith,* 22 Wn. App. 520, 524, 591 P.2d 821 (1979); *see Berne v. Maxham,* 82 Wash. 235, 144 P. 23 (1914).

> If injunctive relief is the sole purpose of the suit, and a temporary injunction has issued upon notice and hearing pending trial on the merits, counsel fees are recoverable as damages resulting from the temporary injunction if the injunction be dissolved at trial. But, where injunctive relief is not the sole purpose of the suit and only incidental or ancillary thereto, counsel fees as damages are recoverable only for services reasonably performed in attempting to quash the temporary injunction and not for professional services rendered in the trial on the merits.

*Cecil v. Dominy,* 69 Wn.2d 289, 293–94, 418 P.2d 233 (1966).

The purpose of this rule is to deter plaintiffs from seeking an unnecessary preliminary injunction or restraining order prior to trial and, consequently, permits recovery of only those fees which a defendant incurs in dissolving such a wrongfully issued injunction or order. *Ritchie v. Markley,* 23 Wn. App. 569, 575, 597 P.2d 449 (1979).

> The point at which the wrongfully issued court order is dissolved is the point at which attorney's fees cease to be recoverable—whether the court order be a preliminary injunction dissolved by trial on the merits, *see Talbot v. Gray,* 11 Wn. App. 807, 812, 525 P.2d 801 (1974); *Kelly v. Schorzman,* 3 Wn. App. 908, 914, 478 P.2d 769 (1970), or a temporary restraining order dissolved by a defendant's motion and hearing, *see Berne v. Maxham,* 82 Wash. 235, 144 P. 23 (1914), or a temporary restraining order dissolved by stipulation of the parties . . .

*Ritchie v. Markley, supra* at 575.

Here, the Wilhelms were served with the temporary restraining order on September 25, 1980. A show cause hearing was held on September 30, 1980, at which time the Wilhelms discovered such order was void because of the failure of White and the Dixons to post the requisite $3,500 bond. At that hearing the Wilhelms agreed to cease con-

struction until the matter was settled. Therefore, the Wilhelms are entitled to attorney's fees incurred in pretrial efforts to dissolve the injunction, *Parsons Supply, Inc. v. Smith, supra* at 525; *Cecil v. Dominy, supra;* but such award is limited to those occurring prior to September 30, 1980. *Ritchie v. Markley, supra.*

The judgment of the trial court is affirmed save for that portion thereof which denied the Wilhelms' counterclaim for attorney's fees. The cause is remanded for a determination of reasonable attorney's fees incurred in pretrial attempts to dissolve the temporary restraining order.

SWANSON and WILLIAMS, JJ., concur.

Reconsideration denied September 2, 1983.

Review denied by Supreme Court November 18, 1983.