B.B.P. CORPORATION, Appellant and
Cross–Appellee,

v.

Michael J. CARROLL, Robert L. Craig,
Jr., Gary A. Gordon, Henry Grant, Pat-
rick D. Miller, Robert A. Sanders, Mi-
chael L. Rice and William M. Sacking-
er, Appellees and Cross–Appellants.

Nos. S–2300, S–2324.

Supreme Court of Alaska.

Aug. 26, 1988.

**520**

Thomas R. Wickwire, Fairbanks, for appellant and cross-appellee.

Lance C. Parrish, Parrish Law Office, APC, Fairbanks, for appellees and cross-appellants Carroll, Craig, Gordon, Grant, Miller, Rice, and Sackinger.

Howard Staley, Staley, DeLisio, Cook & Sherry, Inc., Fairbanks, for appellee and cross-appellant Sanders.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

A subdivider, B.B.P. Corporation (BBP), brought suit against several residents of the subdivision to enforce two protective covenants requiring the cutting of trees. The questions raised on appeal are (1) whether enforcement of the covenants is barred, and (2) whether all of the subdivision residents are indispensable parties.

## I.

BBP appeals from a summary judgment granted on the ground that the resident owners had abandoned the covenants in question. Therefore, the facts below are set forth in the light most favorable to BBP. *See Wilson v. Pollet,* 416 P.2d 381, 383–84 (Alaska 1966).

The original University Heights Subdivision plat was recorded in February 1972 by BBP. BBP owns two lots in the University Heights Subdivision and an additional 40–45 acres that have not yet been developed. Joseph Vogler was and is president of the corporation. He and his wife Doris Vogler are the sole stockholders. They personally own a lot and live in the subdivision, but are not parties to this action.

BBP has developed the subdivision in stages. It appears that after the original platting in 1972, additions were platted in 1976, 1979, 1980, 1982, and 1984. There has not been a final plat for the entire subdivision because a portion remains undivided and will not be developed until the real estate market improves. There are currently approximately ninety-five lots in the subdivision and about eighty-eight residents.

Each of the lot owners' deeds incorporated twelve "protective covenants" which were recorded in 1972. The covenants in dispute in this appeal are numbers five and six, which provide as follows:

> 5—To cut and destroy all Poplar, Cottonwood, and Aspen Trees.
>
> 6—To cut and or [sic] trim any tree or growth which may, by virtue of its height or its inclusion in a dense grove, unreasonably obstruct the view from the dwelling on another lot when that dwelling is situate in the North ⅓ of its lot. The slope of the lot from which the view is involved shall be considered in that the view intended by this covenant is approximately 90° downhill from the general contour elevation lines of said lot.

In 1907 or 1908, a fire burned over the property. Thereafter the first trees to establish themselves were poplar, cottonwood and aspen. According to Vogler, spruce and birch will eventually take over, but it might take 200 years if left entirely to natural growth. The parties regard poplar,

cottonwood and aspen as less desirable trees and have referred to them as "arboreal weeds." Covenant Five was intended to speed the natural process by making room for the more desirable spruce and birch.

Vogler testified that the meaning of Covenant Five was as suggested by its plain language: all of the offending trees were to be cut and destroyed, and a lot would not be in compliance so long as any of them remained.

The resident lot owners have learned through experience that strict compliance is impossible. Vogler testified that he did not know how it would be possible to comply fully, because poplar, cottonwood and aspen trees are extremely hardy: they sprout from the roots and reseed themselves. Even bulldozing all the trees would not bring a lot into compliance because the subject trees would soon spring back. Bulldozing would also cause excessive erosion.

As a result of these problems, none of the lots, including the Voglers', is in full compliance with Covenant Five, and only eighteen of the approximately eighty-eight residents have taken substantial steps toward compliance.

Despite the impossibility of strict compliance, Vogler has consistently urged the other residents to cut these types of trees.

I have not by actions or statements done anything that cound [sic] be taken as my abandoning these covenants. To the contrary, I have progressively asked politely, then more insistently, then demanded that various owners cut their trees as stated in the covenants. This lawsuit is a logical next step in attempting to obtain compliance.

Covenant Ten gave BBP the right to cut trees on noncomplying property and charge the owner for the cost within a period of one to three years after the original transfer of the lot. BBP never exercised this right because Vogler relied in good faith on promises by the residents to cut their trees.

Prior to the instant case, BBP had brought one legal action to compel compliance with Covenant Five, a 1981 suit against Charles and Barbara Milles. BBP ultimately stipulated to a dismissal with prejudice. Vogler claims that BBP's attorney mishandled the case.

On only one occasion has anyone other than BBP attempted to enforce the covenant through legal action. Gary Brewster and Leslie Torrence, in an effort to improve the view from their lot, sued Gary and Melissa Gordon to force them to cut their trees under both Covenants Five and Six. Gary Gordon is also a defendant in the instant case, although Melissa was not joined. Brewster and Torrence also named the Voglers as defendants in their lawsuit, apparently on a theory that the Voglers, as subdividers, had an obligation to enforce the covenants. Apparently, this action has been stayed pending the outcome of the instant litigation.

Covenant Six was intended to give an uphill owner with a house on the upper third of her lot the authority to require a downhill owner to cut trees that interfere with her view looking directly out on a horizontal plane. The intent was "to give a person a reasonable view."

In February 1986, Charles Milles and defendant/appellee Robert Sanders sent a letter to all subdivision residents announcing their candidacy for two seats on the subdivision's Board of Trustees ("the Board" or "the Trustees"). They promised to repeal Covenant Five because of the concerns raised by the Milles and Brewster lawsuits and the apparent desire of the residents not to cut all poplar, cottonwood and aspen trees. Eighty percent of the eligible lot owners voted in the election, and Milles and Sanders were elected by a two to one majority. On March 18, 1986, the newly-elected Board voted unanimously to repeal Covenants Five and Six, and recorded the modification.

A few days before this action of the Board, BBP filed its complaint in the instant suit against Carroll and the other defendants, seeking damages and a mandatory injunction requiring them to comply with the two covenants. Vogler picked these defendants to sue because they were

the "ringleaders" of the "rebellion" to repeal the covenants.

The defendants moved to dismiss the complaint for failure to join all residents of the subdivision as indispensable parties under Civil Rule 19(a). The superior court denied this motion.[1]

However, the superior court granted defendants' motion for summary judgment on the grounds that the covenants were "officially" abandoned, or repealed, by the March 18 vote of the Board of Trustees and further that the covenants were "unofficially" abandoned by the residents through widespread noncompliance before the Board's March 18, 1986 action.

BBP appeals from the grant of summary judgment, and the defendants cross-appeal the denial of the motion to dismiss for failure to join indispensable parties.

## II.

### A. Repeal.

■ The superior court held that the Board of Trustees repealed the two covenants by its action of March 18, 1986. Despite this dispositive holding, BBP failed to argue the issue in its opening brief, but merely asserted in passing that the vote was illegal. We will deem the issue abandoned unless there is plain error, which must affect substantive rights and be obviously prejudicial. *In re L.A.M.*, 727 P.2d 1057, 1059 (Alaska 1986); *Burford v. State*, 515 P.2d 382, 383 (Alaska 1973). We believe this to be the case here.

The authority under which the Board purported to act in voting to repeal the covenants was the procedure set forth with the original recording of the covenants:

> The covenants and procedure herein contained shall remain in force and effect for a period of 10 years following the date of the recording of the final plat and this instrument unless one or more of the covenants and procedures are sooner modified or abrogated by joint agreement by and between the trustees or a majority of them and the owners of three-fourths of all the lots in this subdivision and recorded in the Fairbanks Recording office. The procedure for such agreement shall be by election process, as next set out for following ten year periods.

> Each and every covenant and procedure herein stated shall automatically thereafter for a period of ten years remain in effect unless, during the tenth year of each ten year period, a resident petitions the trustees for a change in said covenants or procedure whereupon the trustees shall hold an election and if three-fourths of the residents voting agree in writing to a modification or abrogation of any covenant or procedure, the trustees shall cause the same to be modified by recording a modification signed by at least two trustees. Such modification instrument shall clearly set forth the restriction or restrictions or procedures abrogated, and/or modified, and the modification or modifications, and shall also specify the date the election was held and the results thereof. This instrument shall be verified under oath by the executing trustees.

Appellees assert that the repeal was valid, noting that the procedure in the recorded instrument allows the Board to repeal a covenant if it votes to do so unanimously. BBP asserts that the procedure always requires a three-fourths vote of the residents to repeal.

Appellees seem to read the language of the first paragraph as establishing two alternative means of modifying or abrogating the covenants: "by joint agreement by and between [1] the trustees *or* [2] a majority of them and the owners of three-fourths of all the lots." BBP seems to read the same language to establish one procedure with two necessary elements: "by joint agreement by and between [1] the trustees or a majority of them *and* [2] the owners of three-fourths of all the lots."

We conclude that BBP's interpretation is correct. The sentence following the disputed sentence provides, "The procedure for such agreement shall be by election

**1.** Defendant Sanders did not join in the motion to dismiss and did not appeal the denial thereof.

process, as next set out for following ten-year periods." The reference to "such agreement" suggests that only one type of agreement was described in the preceding sentence, rather than the two suggested by the appellees. Moreover, the election process described subsequently clearly requires a three-fourths vote of the residents.[2]

For these reasons, we hold that the failure to hold an election rendered the purported repeal invalid, and summary judgment was not warranted on this ground.

### B. *Abandonment.*

In reviewing a grant of summary judgment, we must determine whether there is a genuine issue of material fact, viewing the facts in the light most favorable to the non-moving party, and whether the moving party is entitled to judgment on those facts as a matter of law. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985); *see* Alaska R.Civ.P. 56(c). Employing this standard, we hold that Covenant Five, but not Covenant Six, has been abandoned.

The superior court found that the covenants were "unofficially" abandoned before the Board of Trustees voted to repeal them:

4. A review of recent photographs of the land encompassed by the original University Heights Subdivision and its various additions as well as a 1979 aerial photograph shows that no significant steps have been taken toward compliance by a significant number of the landowners in University Heights Subdivision and its various additions. No party contends that any landowner is in strict compliance. Under a view most favorable to the plaintiff, only approximately 18 residents have taken substantial steps to-ward compliance. Plaintiff admits that there are no lots free from poplar, cottonwood or aspen trees and that strict compliance may not even be possible.

5. There is no genuine issue of material fact concerning the lack of compliance with and failure to enforce the covenants. The covenants were "unofficially" abandoned prior to March 18, 1985.

(Emphasis in original.)

BBP does not dispute the widespread lack of compliance and the impossibility of full compliance with Covenant Five, but merely disputes the legal conclusion that this constitutes abandonment, terminating the covenant.

Numerous courts have held that a covenant may terminate by abandonment. "If a covenant which applies to an entire tract has been habitually and substantially violated so as to create an impression that it has been abandoned, equity will not enforce the covenant." *White v. Wilhelm,* 34 Wash.App. 763, 665 P.2d 407, 411 (1983) (quoting *Sandy Point Improvement Co. v. Huber,* 26 Wash.App. 317, 613 P.2d 160, 162 (1980)). In *White,* the defendants had failed to get approval of the Architectural Control Committee, as required by a subdivision covenant, before building an enclosure for their swimming pool. The court affirmed a finding of the trial court that the covenant was abandoned because there had been no Architectural Control Committee in existence for several years, and there had been numerous violations. *Id.* *Accord Sandstrom v. Larsen,* 59 Haw. 491, 583 P.2d 971, 976 (1978); *Robinson v. Donnell,* 374 So.2d 691, 693–94 (La.App.1979); *Dierberg v. Wills,* 700 S.W.2d 461, 466 (Mo. App.1985); *Tompkins v. Buttrum Const. Co. of Nev.,* 99 Nev. 142, 659 P.2d 865, 867 (1983); *Sanders v. McCammon,* 365 P.2d

---

2. In addition, the structure of the disputed sentence makes more sense this way. Under the appellees' interpretation, modification can be made "by joint agreement by and *between* the trustees." However, there are five trustees, not two. Therefore, it would be grammatically incorrect to use the word "between;" it should be by joint agreement *among* the trustees. Additionally, the use of the phrase "a majority of them" rather than "a majority of the trustees" suggests that the phrase was to be read in conjunction with the preceding phrase "by and between the trustees."

These stylistic problems are eliminated under BBP's interpretation. The joint agreement would be *between* two parties: the trustees (by majority) and the owners (by three-fourths vote). In addition, the phrase "the trustees or a majority of them" flows more naturally.

730, 732 (Okla.1961); *Reading v. Keller*, 67 Wash.2d 86, 406 P.2d 634, 637 (1965).

We join these courts and hold that a covenant will be deemed abandoned when the evidence reveals substantial and general noncompliance. Even viewing the evidence in the light most favorable to BBP, it is clear that the residents of the subdivision have abandoned Covenant Five under this standard. None of them are in full compliance, and only a fraction have taken substantial steps toward compliance.

The difficulty of compliance is an additional factor supporting the finding of abandonment in the instant case. The covenants as written suggest that a one-time cutting of poplar, cottonwood, and aspen trees would be sufficient to comply. The "cut and charge" remedy of the subdivider in Covenant Ten extended only three years, suggesting that no further action would be needed after that time.

Now, however, it is apparent that full compliance is impossible and substantial compliance would be extremely burdensome. The remedy that BBP proposes would require constant vigilance. Vogler testified by affidavit:

I believe if every lot owner in the subdivision were to work a little each year towards cutting and thinning out these trees, we would all be working toward the same goal and it would produce a more beautiful—and more valuable—subdivision each year.

The requirement of cutting and thinning each year far exceeds the cutting that was apparently contemplated by the covenants originally. Thus, the residents would be subject to a far heavier burden than they originally bargained for.

Viewing the evidence most favorably to BBP, we cannot conclude that Covenant Six has been abandoned. It is clear that Covenant Six was designed solely to allow an uphill lot owner to require a downhill owner to cut trees that obstructed her view. Vogler testified:

A. ... This was a general provision attempting to give a person a reasonable view. And that's all.

Q. So, who is to decide for each lot?

A. The man who owns it. He decides what he needs in front for his view looking out at 90 degrees. He's the one to enforce it.

The evidence presented, viewed most favorably to BBP, suggests that the residents have largely complied with Covenant Six, unlike Covenant Five. Two of the residents averred that few if any residents were complying with Covenant Six. However, both of these residents, and numerous others, testified that they had cut trees on their lots in response to requests from uphill owners. The parties have brought to our attention only two instances in which a resident refused to honor the request of an uphill owner to cut trees to the extent allegedly required by Covenant Six. Thus, there are clearly disputed facts regarding abandonment of Covenant Six, and summary judgment was not appropriate on this ground.

### III.

Civil Rule 19(a) provides in relevant part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been joined, the court shall order that he be made a party.

Appellees, excluding Sanders, argue in their cross-appeal that in the absence of the unjoined residents, "complete relief cannot be accorded among those already parties" under Rule 19(a)(1). They further argue that the absent parties cannot all be joined, and that applying the balancing test an-

nounced in *State, Department of High-ways v. Crosby,* 410 P.2d 724, 725–26 (Alaska 1966), the action of BBP must be dismissed under Rule 19(b).[3]

■ We disagree. The absence of the unjoined residents creates no barrier to granting complete relief among those who are parties. Although the cross-appellants are correct in arguing that there is some risk of multiple suits and inconsistent judgments within the subdivision, there is not a "substantial risk" that any single lot owner will be subject to inconsistent obligations, which is the more serious concern. *See* Alaska R.Civ.P. 19(a)(2)(ii).

Moreover, the risk of multiple lawsuits is always present where the issue of abandonment of a subdivision covenant is involved. Some subdivisions have over 1000 lots. *See, e.g., Sandy Point Improvement Co. v. Huber,* 26 Wash.App. 317, 613 P.2d 160, 162 (1980). We are aware of no cases that address the issue of whether all residents are indispensable parties to a suit raising an issue of abandonment of a subdivision covenant, but it is significant that all residents are rarely, if ever, parties to these cases. As a general rule, these cases have as parties only a small group of neighbors, or the developer and a resident. *See Sandstrom v. Larsen,* 59 Haw. 491, 583 P.2d 971, 976–77 (1978) (two neighbors as parties; court found no abandonment); *Tompkins v. Buttrum Constr. Co. of Nev.,* 99 Nev. 142, 659 P.2d 865, 867 (1983) (developer and one resident as parties; court found no abandonment); *Sanders v. McCammon,* 365 P.2d 730, 732 (Okla. 1961) (twelve residents as parties; covenant found to be abandoned); *White v. Wilhelm,* 34 Wash. App. 763, 665 P.2d 407, 411 (1983) (three neighbors as parties; covenant found to be abandoned); *Sandy Point Improvement Co.,* 613 P.2d at 162 (developer and one resident as parties; court found no abandonment).

To require all residents of a subdivision to be parties to any lawsuit raising an issue of abandonment of a covenant would place a heavy burden on the courts and on the parties. With approximately eighty-eight residents, this subdivision is no exception. The courts have traditionally resolved these issues satisfactorily without the joinder of all residents. Cross-appellants have not presented any evidence that joinder is for some reason more important in this case than in other similar cases.

■ However, we think the superior court overlooked an important argument made by cross-appellants. Several of them —namely Carroll, Craig, Gordon, Miller, and Rice—own their property together with their wives, who were not joined as defendants.[4] As a general rule, an owner of property must be joined as an indispensable party in any action that may adversely affect her interest in the property. *E.g., Rossiter v. Rossiter,* 4 Haw.App. 333, 666 P.2d 617, 620 (Haw.App.1983); *Bonneville Tower Condominium Management Comm. v. Thompson Michie Assocs.,* 728 P.2d 1017, 1019 (Utah 1986). *See also Sylvester v. Sylvester,* 723 P.2d 1253, 1259 (Alaska 1986) (grantee of alleged fraudulent conveyance is indispensable to proceeding to strike the transfer); *Sowash v. Garrett,* 630 P.2d 8, 12 n. 3 (Alaska 1981) (seller of real property is indispensable in action for specific performance of alleged contract to sell). Tenants in common are not always indispensble parties to litigation involving the property, particularly where the judgment will not directly affect the interests of the co-tenant. 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 19.09[2] (1987). However, co-tenants should be joined where "the right of any one tenant is not distinct and the relief

---

**3.** The cross-appeal was taken and urged to be considered in the event this court did not sustain the superior court's grant of summary judgment as to the covenants on either repeal or abandonment rationales. A grant of summary judgment will be affirmed if there are grounds other than those relied on by the trial court that support the result. *Carlson v. State,* 598 P.2d 969, 973 (Alaska 1979); *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961).

**4.** Apparently the reason BBP sued only the husbands was that, as noted above, they were the "ringleaders" in the effort to repeal the covenants.

sought is interwoven with the rights of the other tenants." *Id.* at 19–181 (footnote omitted). *See also* 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1621, at 305–06 (1986).

This is clearly such a case. It directly raises the enforceability of two protective covenants. These covenants, if enforceable, place obligations on all tenants in common, not only the husbands, and may affect property values to the benefit or detriment of all of them.

For this reason, we hold that the co-tenants should have been joined. However, this does not warrant the conclusion that the complaint of BBP should have been dismissed. The appropriate remedy was to order that the spouses of Carroll, Craig, Gordon, Miller and Rice be joined. Alaska R.Civ.P. 19(a) ("If [the indispensable party] has not been joined, the court shall order that he be made a party."). There has been no showing that the spouses could not be made parties such that dismissal might be warranted under Rule 19(b).

In fashioning appropriate relief at the appellate level for failure to join an indispensable party, this court must consider the significance of the fact that a binding judgment has already been entered. *Padgett v. Theus*, 484 P.2d 697, 702 (Alaska 1971). As discussed above, we conclude that the summary judgment must be affirmed as to Covenant Five. If the spouses had been joined, this judgment would have benefited them as well. Thus, there is no reason that they must be joined before affirming this portion of the judgment. However, as discussed previously, we reverse the superior court's grant of summary judgment as to Covenant Six. Consistent with our prior decisions, we order that cross-appellants' wives be joined pursuant to Rule 19(a) in connection with further proceedings on remand in regard to Covenant Six. *See Sylvester v. Sylvester*, 723 P.2d 1253, 1259, 1260 n. 10 (Alaska 1986); *Sowash v. Garrett*, 630 P.2d 8, 12 n. 3 (Alaska 1981).

In conclusion, we affirm summary judgment in favor of appellees/cross-appellants as to Covenant Five on the ground that it was abandoned through noncompliance. We reverse the summary judgment as to Covenant Six and remand for further proceedings upon joinder of appellees'/cross-appellants' wives pursuant to Civil Rule 19(a).

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.