**Gary GORDON and Melinda Gordon, Appellants,**

v.

**Ann Stoloff BROWN, Gary Brewster and Leslie Torrence, Appellees.**

**No. S–4351.**

Supreme Court of Alaska.

July 10, 1992.

Rehearing Denied Aug. 13, 1992.

proved rate which was never determined to be    reasonable.

James A. Parrish, Parrish Law Office, APC, Fairbanks, for appellants.

Fred G. Brown, Fairbanks, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

### INTRODUCTION

This case concerns the interpretation of a University Heights Subdivision covenant requiring a downhill landowner to cut trees to preserve the view for the benefit of uphill neighbors.

### FACTS AND PROCEEDINGS

The University Heights Subdivision was developed by the B.B.P. Corporation, and Joe Vogler and Doris Vogler, the corporation's sole shareholders. In approximately 1972, the original plat for the subdivision was set out. The subdivision is currently composed of eight additions which have a total of 60 or 70 lots of two to three acres in size. At purchase, each lot owner signed a deed containing twelve protective covenants. This case concerns covenants 5 and 6.

In August 1984, Gary Brewster and Leslie Torrence sought to compel Gary Gordon and Melinda Gordon to cut trees on the Gordon property, based on restrictive covenants 5 and 6. Brewster and Torrence (Torrence) owned Lot 22 in the University Heights 6th addition, while the Gordons own Lot 10 in the University Heights 5th addition. Lot 10 is situated downhill to the south and west of Lot 22. At the time the parties bought their respective parcels, they signed a copy of the restrictive covenants, with which they agreed to comply. The relevant restrictive covenants provide:

> The following covenants are expressly agreed and accepted as a contractual consideration for this property transfer by all parties:
>
> . . . .
>
> 5. To cut and destroy all Poplar, Cottonwood, and Aspen trees.
>
> 6. To cut and or trim any tree or growth which may, by virtue of its height or its inclusion in a dense grove, unreasonably obstruct the view from the dwelling on another lot when that dwelling is situated in the North 1/3 of its lot. The slope of the lot from which the view is involved shall be considered in that the view intended by this covenant is approximately 90 degrees downhill from the general contour elevation lines of said lot.

In an order dated July 3, 1986, Superior Court Judge Blair found that the protective covenants applied to all additions of the University Heights subdivision. In that same order, the court denied both parties' motions for summary judgment, reserving the issue of whether a recent attempt to repeal the restrictive covenants requiring the removal of trees was effective.

The parties stipulated to a continuance of the case to allow the superior court, and later this court, to resolve the remaining issue concerning the repeal of the covenants in the related case, *B.B.P. Corporation v. Carroll*, 760 P.2d 519 (Alaska 1988). In *B.B.P. Corporation*, we held that a recent attempt to repeal the covenants was invalid because proper election procedures were not followed. *Id.* at 523. We further held that covenant 5 was abandoned. *Id.* at 524. Viewing the facts in the light most favorable to the developer, we observed that there were clearly disputed facts as to the abandonment of covenant 6 and remanded for further findings. *Id.*

. After the decision in *B.B.P. Corporation*, Torrence moved again for summary judgment. Superior Court Judge Steinkruger found that Torrence no longer owned the property and therefore under the terms of the covenant, only Ann Stoloff Brown, the new owner as of April 28, 1988, had standing to enforce the covenant. Accordingly, the superior court entered summary judgment against Torrence.

Brown was made a party plaintiff given her status as the new owner of lot 22 and the litigation continued. Brown then moved for summary judgment "so as to require Defendants GORDON to cut or trim all trees which interfere with her view in looking directly out on the horizontal plane at 90 degrees from the elevation con- tour lines of the upper third of her lot." The Gordons opposed the motion and filed a cross-motion, arguing that Brown could not enforce the covenant because her house was not on the north one-third of her lot. The Gordons also argued that Brown's view from a horizontal plane was not obstructed and that the view at 90 degrees downhill from the contour lines was not obstructed.

After a bench trial, the superior court entered a decision requiring Brown to bear the costs of establishing which trees obstruct Brown's 90 degree downhill covenant view and requiring the Gordons to cut those trees.

This appeal followed.

## DISCUSSION

### Was the covenant enforceable?

Covenant 6 allows the owner of an uphill lot to require a downhill lot owner to cut trees which unreasonably obstruct the view from the uphill owner's dwelling when the uphill owner's dwelling is "situated in the North 1/3 of its lot." The superior court stated that "the parties agree the dwelling is not entirely in the north one-third of its lot."[1] The superior court found, despite the fact that Brown's house was not entire- ly in the northern one-third of the lot, that the covenant was enforceable because the house was built "primarily in the uphill portion or the north one-third."[2] The in-

---

1. At trial, the parties agreed that plaintiff's Exhibit 2, drawn by expert witness Fitzgerald, was a reasonable representation of the division of the lot into thirds.

2. In its Decision and Order, the superior court stated:

    The question then arises as to whether plaintiff Ann S. Brown's house is "situated on the North one-third of its lot." The parties agree the dwelling is not entirely in the north one-third. The house is slightly over half in the north one-third. The "viewing area" of the house, which is along the front of the house facing the valley, is just outside of the north one-third, and is in the middle one-third of the lot. Applying a common meaning to the word "situated", it means site, location or place. *See, e.g., Webster's New 20th Century Dictionary*, Unabridged 2nd Edition (1964), *Webster's New International Dictionary*, Unabridged 2nd Edition (1959), and *Webster's*

*Third New International Dictionary*, Unabridged (1966).

    This court finds a reasonable interpretation of "situated" should be applied to the facts set forth in Exhibit 2. This court finds a reasonable interpretation of "situated" as applied to the location of the house depicted in Exhibit 2 is that Brown's house is sufficiently located in the north one-third of Lot 22 to invoke covenant 6. In other words, the house is situated primarily, if not wholly, within the north one-third of the lot. Reading the entire instrument along with the surrounding circumstances described by Mr. Vogler convinces this court, by a preponderance of the evidence, of an intent to provide uphill land owners with a view, so long as they build primarily in the uphill portion or the north one-third or the upper one-third of their lot. Ann Brown's house is primarily on the north or upper one-third of her lot. Accordingly, Ms. Brown is entitled to enforce the covenant. Nevertheless, the court makes a clear finding

terpretation of covenant 6 is a question of law in which the court may exercise its "independent judgment to determine whether the relief granted by the superior court was proper under the established facts." *Lamoreux v. Langlotz*, 757 P.2d 584, 585 n. 3 (Alaska 1988) (citing *Walsh v. Emerick*, 611 P.2d 28, 30 (Alaska 1980)).

The Gordons ask the court to interpret "situated in the North 1/3 of its lot" to mean situated *entirely* in the north one-third. Alternatively, they argue that at least the viewing area must be situated in the north one-third. The Gordons rely on Webster's Dictionary for the following definition of "in":

> contained or enclosed by, inside; within; as *in* the room, *in* the envelope.

*Webster's New Universal Unabridged Dictionary,* (2d ed. 1983).

We find that the language of covenant 6 requiring the downhill lot owner to cut trees obscuring the view from the uphill dwelling "when that dwelling is situated in the north one-third of its lot" is clear and unambiguous. In *Lamoreux v. Langlotz,* this court summarized the principles applicable to the construction of covenants as follows:

> Covenants are construed to effectuate the parties' intent. Clear and unambiguous language should be accorded its plain meaning. Because restrictions are in derogation of the common law, they should not be extended by implication and doubts should be resolved in favor of the free use of land.

(Citations omitted.) 757 P.2d 584, 587 (Alaska 1988). *See also Lenhoff v. Birch Bay Real Estate, Inc.,* 22 Wash.App. 70, 587 P.2d 1087, 1089 (1978) ("in determining intent, clear and unambiguous language will be given its manifest meaning.... Restrictions being in derogation of the common-law right to use land for all lawful purposes, will not be extended by implication to include any use not clearly ex-

pressed. Doubts must be resolved in favor of the free use of land."); *Greenbrier–Cloverdale Homeowners Ass'n v. Baca,* 763 P.2d 1, 2 (Colo.App.1988) ("A restrictive covenant that is clear on its face should be enforced as written. Any doubts as to the meaning of a covenant should be resolved against restricting the use of the land and in favor of its free and unrestricted use."); 5 POWELL ON REAL PROPERTY ¶ 674 n. 1 (1991) ("Words are given their plain meaning and unambiguous covenants are enforced as written.") (citations omitted). Applying these principles governing the interpretation of covenants, we hold that the Brown dwelling is not "situated in the north one-third of its lot" and, therefore, the covenant is unenforceable in this instance.

Relying on *B.B.P. Corporation,* Brown contends that the north one-third means the upper one-third of the lot in terms of elevation. 760 P.2d at 521. Although it is undisputed that the elevation of the portion of Brown's house in the middle one-third of the lot is the same as the elevation of the portion in the upper one third, we believe this argument is without merit. In *B.B.P. Corporation,* this court introduced the "upper one-third" language merely to summarize covenant 6. 760 P.2d at 521. We neither reached the issue of whether "north one-third" means acreage or elevation nor intended to introduce a new requirement to covenant 6.

Therefore we agree with the superior court's conclusion that the "north one-third" language applies to acreage and not to elevation. The covenant requires that the house be situated in the "north one-third" of the lot. In this context, north does not describe elevation, but rather direction. The testimony of expert witnesses Fitzgerald and Scarborough regarding surveyors' interpretations of "north one-third" buttresses the trial court's conclusion. Clearly, the house is not situated within the north one-third of the lot's acreage.[3] Thus,

---

that the house if [sic.] not entirely in the north one-third of her lot. Should a higher court find that "situated in the North one-third" means entirely within the north one-

third, then, Brown has no right to enforce the covenant.

3. Alternatively, Brown submits that she is entitled to a view from her den because it is undisputed that a portion of the den is located within

we reverse the superior court's holding that this requirement was satisfied and conclude that the covenant is not enforceable by Brown.[4]

Accordingly, the decision of the superior court is REVERSED.

MATTHEWS, Justice, dissenting.

Covenant 6 is not intended to be a setback regulation preventing homeowners from building on the middle or southern third of their lots. Instead, the covenant's reference to the "north one-third" is meant to fix the point from which the obligation to clear trees on downhill lots should be measured. If one were to build a house entirely on the north one-third of a lot, the measurement point would be set at an elevation determined by the viewing area in the house. From this point, a sighting downhill could be taken to determine what trees obstruct the view. The same point can be determined by hypothesizing a typical house built on the north one-third of a lot, even if no house is built or if one is built outside the confines of the north one-third.

To illustrate my disagreement with the majority opinion I offer the following example. Assume that a house is built entirely on the north one-third of a lot. The covenant should be fully enforceable based on a measuring point established from the viewing area in the house. Assume next that the owner of the house decides to add on and builds a wing of the house onto the middle one-third of the lot. Should the covenant become unenforceable when this addition is built? If I understand the rationale of the majority opinion correctly, the answer to this question is that the covenant becomes unenforceable because the dwelling is no longer within the "north one-third" of its lot, even though the measuring point from which the obligation to clear trees on downhill lots has not changed. This result is correct only if the covenant was intended to operate as a setback requirement. As that was manifestly not the purpose of the covenant, the result in the hypothetical and the majority's resolution of this case are at odds with the rule that a covenant should be construed to accomplish its intended purpose. *Lamoreux v. Langlotz*, 757 P.2d 584, 587 (Alaska 1988).

The trial court should determine what the sighting point would be if Brown's house was entirely situated on the northern one-third of her lot. Because such a point was not determined, I would remand for that purpose. In all other respects I would affirm the trial court's decision that the covenant is enforceable.

---

the north one-third of the lot, although the viewing windows are in the middle one-third. This claim is without merit because the covenant clearly requires the dwelling, not just a portion of the viewing area, to be situated in the north one-third of the lot.

4. The Gordons argue that the covenant is not enforceable by Brown because she and the Gordons live in different additions of the University West Subdivision. They also submit that the trial court erred in admitting evidence of subjective intent, particularly in the testimony of Joe Vogler. Both parties challenge the superior court's interpretation of the view provided by the covenant. Our holding that the house is not situated in the north one-third of the lot makes it unnecessary to address the other arguments which have been raised by the parties in this appeal.