NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL UNION OF OPERAT-
ING ENGINEERS, LOCAL NO. 12,
AFL–CIO, Respondent.

No. 18329.

United States Court of Appeals
Ninth Circuit.

Oct. 9, 1963.

Stuart Rothman, Gen. Counsel, Dom-
inick L. Manoli, Associate Gen. Counsel,
Marcel Mallet-Prevost, Asst. Gen. Coun-
sel, and Allison W. Brown, Jr., and
Joseph C. Thackery, N. L. R. B., Wash-
ington, D. C., for petitioner.

Brundage, Hackler & Roseman, and
Charles K. Hackler, Los Angeles, Cal.,
for respondent.

Before HAMLEY and KOELSCH, Cir-
cuit Judges, and CARR, District Judge.

CARR, District Judge.

This is a petition of the National La-
bor Relations Board pursuant to Section
10(e) of the National Labor Relations
Act, as amended (29 U.S.C. § 160(e)),
for enforcement of its order issued
against respondent, Local 12. The
Board's decision is reported at 135 NLRB
No. 119. This court has jurisdiction un-
der 29 U.S.C. § 160(e) since the alleged
unfair labor practices occurred in Cali-
fornia.

Pacific Pipeline Construction Com-
pany, here referred to as Pacific, and
Engineers Limited Pipeline Company,
here referred to as Engineers Limited,
and both collectively referred to as Em-
ployer, were joint venturers for the in-
stallation of a pipeline known as the
Pisgah project.

The Board, adopting the Trial Exam-
iner's findings and conclusions, found
that Local 12 violated Sections 8(b) (1)
(A) and 8(b) (2) of the Act by causing
the Employer to discriminatorily dis-

charge Lloyd D. Sands in violation of Section 8(a) (3) of the Act.[1]

Both Pacific and Engineers Limited were members of the Associated General Contractors' Southern California chapter, which association was a party to a contract, hereafter referred to as AGC contract, with respondent International Union of Operating Engineers, Local 12, hereafter referred to as Union.

Both joint venturers were also parties to the National Pipeline Agreement, hereafter referred to as National Agreement, with the respondent Union's parent body, the International Union of Operating Engineers.

This contract was dated May 1, 1957, and was to expire April 30, 1960, approximately two months before the completion of the Pisgah project. The AGC contract was dated January 1, 1959, and continued in effect until January 1, 1962.

On January 8, 1960, shortly prior to the official beginning of work on the project, representatives of the Employer held a pre-job conference with representatives of trade unions whose respective crafts were to be employed on the project, including representatives of the respondent Union.

The testimony is in dispute as to what occurred at this meeting. A representative of the Employer testified that it was declared at the conference by the vice president of the Employer that the project would operate under the National Agreement. However, the testimony on behalf of the Union was to the effect that there was no such understanding.

At the conference, a form entitled "Memorandum of Pre-job Conference" was filled out and signed by the Employer and the Union. Among other things the memorandum stated that certain additional wage rates would be "Based on A.G.C. Agreement" and that "Notification of manpower needs will be directed to San Bernardino office * * *."

During the pre-job conference, there was discussion respecting the Employer's bringing some of its employees to the project. The Local 12 representatives asked if Employer had a list and were told by Employer's representative that he did not at that time have such a list. The complaining employee, Lloyd D. Sands, had been hired by the Employer prior to the pre-job conference and he was neither a member of Local 12 nor was he hired through that hiring hall. On January 11, the Union representative visited the job and began checking the work histories of the men on the job. When he learned that Sands, previously a side boom operator for the Employer, was working as a utility em-

1. The pertinent statutory sections of the National Labor Relations Act are as follows:

Section 8(a) (3).

" * * * It shall be an unfair labor practice for an employer—

   *    *    *    *    *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *"
29 U.S.C.A. § 158(a) (3) (Supp.1962)

Section 8(b) (1) (A).

" * * * It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *"
29 U.S.C.A. § 158(b) (1) (A) (1956)

Section 8(b) (2).

" * * * It shall be an unfair labor practice for a labor organization or its agents—

   *    *    *    *    *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;" 29 U.S.C.A. §§ 158 (b) (2) (1956)

Note: See Footnote 2 for Section 157 of this Title 29.

ployee, he complained to the Employer that Sands had not been obtained through the local hiring hall. Shortly thereafter Sands was discharged and he filed a complaint with the National Labor Relations Board. He was reemployed and, after a threat of a strike, was again discharged on March 1.

The AGC contract provided that the source of the Employer's workmen, except for persons agreed to at the pre-job conference, was limited to the dispatching office or hiring hall of Local 12, which was to service the particular construction project. The AGC contract required that the Union maintain non-discriminatory employment lists and prohibited job referrals based upon membership or non-membership in the Union.

The Board adopted the findings, conclusions, and recommendations of the Trial Examiner that Local 12 violated Sections 8(b) (2) and 8(b) (1) (A) of the Act by causing the Employer to discharge Sands, in violation of Section 8 (a) (3), because he had not been referred through Local 12's hiring hall. In so concluding, the Board found, contrary to Local 12's contention, that the terms of the National Pipeline Agreement rather than the AGC contract were applicable to the job and that, since the National Agreement contained no provision for an exclusive hiring arrangement, Local 12 was not justified in causing Sands' removal from the Pisgah project for his failure to obtain his job through Local 12's hiring hall. The Board ordered Local 12 to cease and desist from causing or attempting to cause the Employer or any other member of the Pipeline Contractors Association to discriminate in violation of Section 8(a) (3) of the Act, or from in any like or related manner restraining and coercing employees in

the exercise of their rights guaranteed them under Section 7 of the Act.[2] Local 12 was also ordered to notify the Employer that it had no objection to Sands' employment and to make Sands whole for any loss of pay suffered by reason of the discrimination against him and to post appropriate notices.

■ It must be noted that the determination of this dispute rests primarily upon which of the three following contracts are controlling: (1) the National Pipeline Agreement, (2) the AGC contract, and (3) the pre-job conference agreement. If the exclusive hiring hall provision of the AGC contract applies to the situation at hand, then Local 12 did not engage in an unfair labor practice within the meaning of the National Labor Relations Act since such non-discriminatory hiring hall provisions are not unlawful. Local 357, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed. 2d 11 (1961). Local 12 was merely persuading the Employer to comply with a binding contractual agreement. Although great weight is attached to the findings of the Board when a court of appeals is considering a petition for enforcement of a Board order under Section 10(e) of the National Labor Relations Act (29 U.S.C. § 160(e)) and also as to matters not requiring expertise, a court may not displace the Board's choice between two conflicting views even though the court would justifiably have made a different choice had the matter been before it *de novo*. The Supreme Court has pointed out that:

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find

2. Section 7 of the National Labor Relations Act provides:
   "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."
   29 U.S.C.A. § 157 (1956).

548

that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951).

Here, however, we are not faced with a review of the evidence to determine whether or not the findings of the Board were supported by substantial evidence. On the contrary, it appears to be a determination of a question of law, that is, whether the National or the AGC contract took precedence with respect to the hiring of workmen.

■■■■ A review of the Trial Examiner's Report and Recommended Order which was adopted *in toto* by the Board reveals that the Trial Examiner failed to give proper consideration to the effect of the AGC contract upon the National Agreement. Since ordinarily the legal effect of a contract is determined by a court as a matter of law,[3] this court is not bound to accept the Trial Examiner's findings and conclusions in regard to the effect of the AGC contract upon the National Agreement. Furthermore, it should be noted that the Trial Examiner found "Therefore during all times material herein Engineers as well as Pacific was bound by the terms of the AGC contract." Since both contracts were in force, the question arises as to which took precedence with respect to the Pisgah job. The provisions of these two contracts are inconsistent with each other and since the contracts were entered into by the same parties and cover the same subject matter, it is a well settled principle of law that the later contract supersedes the former contract as to inconsistent provisions. In re Ferrero's Estate, 142 Cal.App.2d 473, 298 P.2d 604, 607, 608 (1956); Restatement, Contracts, § 408 (1932); 6 Corbin, Contracts, § 1296 (2d ed., 1962); 17A C.J.S.

Contracts § 379, at pp. 441–442 (1963); 12 Cal.Jur.2d, Contracts, § 123, at p. 235 (1953). It, therefore, appears that unless the pre-job conference order altered or amended the AGC contract it must follow that the Union was within its right in demanding that the Employer obtain its workmen through Local 12. While there is dispute between the parties as to what occurred at the pre-job conference, it would be difficult for this court to conclude that there was substantial evidence to support a conclusion that the pre-job conference memorandum was intended to alter or amend the AGC contract. In this connection it should be noted that the Trial Examiner stated:

"I am unable to say that the Pisgah job was controlled by the AGC contract as a matter of law, regardless of the understanding of the parties. And I am unable to say on the basis of the evidence afforded me, that there was a clear understanding between the parties that the hiring procedures of the AGC contract controlled."

Yet the Trial Examiner concluded that the memorandum agreement was intended to, and did, modify certain terms of the National Agreement, but "there was no understanding between the parties that the hiring arrangements of the National Agreement were set aside and superseded by provisions of the AGC contract." Obviously, the Trial Examiner was erroneously proceeding on the theory that the National Agreement took precedence over the AGC contract, which is not the case as a matter of law. The only matter remaining requiring attention is the fact that Sands had been previously employed by the Employer and, if he were a key man, the Employer might be entitled to use him under Article III(A) (2) of the AGC contract. This provision in the contract provided that when an employer needed key men—

" * * * there shall be a pre-job conference at which the classifica-

---

3.  17A C.J.S. Contracts § 616, at pp. 1240–1248 (1963); Citizens Utilities Co. v. Wheeler, 156 Cal.App.2d 423, 319 P.2d 763, 769 (1957); 12 CAL. JUR. (2d) Contracts, § 119, at p. 324 (1943).

tions to be filled by such employees and the number of employees, in each classification * * * shall be determined."

Not only was Sands' name not listed at the pre-job conference, but it is to be noted that he was a side boom operator which might or might not be a key position and he was doing utility work. This evidence would certainly not sustain a finding that Sands was, in fact, a key man or that he was selected pursuant to the above mentioned provision in the contract.

Since it is our conclusion that the AGC contract was operative and in effect, Local 12 was entitled to insist that there was a binding contractual provision which required the use of its hiring hall for the employment of construction workers in connection with the Pisgah project. The petition of the National Labor Relations Board is denied.