Argued March 26, affirmed as modified July 2,
reconsideration denied August 14, petition for review
denied September 5, 1979

RISSBERGER, *Respondent,*
*v.*
GORTON, *Appellant.*

(No. 77-1256, CA 11488)

597 P2d 366

Resubmitted in banc without oral argument June 26, 1979.

John A. Hudson, Eugene, argued the cause for appellant. With him on the brief was Curtis, Hendershott, Strickland & Hudson, Eugene.

Scott M. Galenbeck, Springfield, argued the cause for respondent. With him on the brief was Lively & Wiswall, Springfield.

Before Schwab, Chief Judge, and Lee, Buttler and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

■ Plaintiff brought this suit for a declaration that she and defendant are joint and equal owners of certain real and personal property acquired while they were living together. The trial court entered a decree for plaintiff. Defendant appeals. Both parties concede that the matter as pleaded is equitable.[1]

The parties first moved in together in the summer of 1969, when defendant was 21 and plaintiff 18. They lived together again the following summer; but each fall when they returned to college, they lived in separate apartments. In 1971 they cohabited throughout the summer and until November, when they separated and began dating other people. In February or March, 1972, they resumed cohabitation and lived together until February, 1977.

During the period of separation in 1971-72, defendant looked for a duplex to buy. Around the time he and plaintiff reconciled, he found one. She testified that he gave her a copy of the listing on the property and talked with her about it. He denied that. On March 29, after they had begun living together again, he signed an earnest money agreement on the property in his own name. The duplex was purchased on a contract, in which he was named as the buyer. Plaintiff was not involved in the closing. The title, which was placed in escrow, was in defendant's name alone. Plaintiff claimed she did not realize until after the closing that

---

[1] Plaintiff alleged that she "has no substantial legal remedies except" a declaratory judgment. Defendant did not plead to that allegation, and it was not in issue at trial. Nonetheless, we note that most of plaintiff's claim was that her money was used directly or indirectly by defendant to buy real *and personal* property. Also, it was the thrust of her case that it was unfair for defendant to keep the benefits of her money. Thus, it appears that plaintiff's goal of defeating defendant's purported unjust enrichment could have been achieved by an action for restitution. Therefore, there may well have been a legal remedy. Moreover, plaintiff's prayer did not request any particular equitable remedy—just a declaration that she was "a joint and equal owner" of the property. Apparently ORS 28.010 does permit that sort of declaration, independent of the question of remedy. *See Oregon Farm Bureau v. Thompson*, 235 Or 162, 191, 384 P2d 182 (1963); *Flaherty v. Bookhultz*, 207 Or 462, 472, 297 P2d 856 (1956).

[67]

title would be taken that way. The purchase price was $23,750. The down payment of $2,962 was paid from separate funds defendant had received as disability compensation.

The parties moved into one-half of the duplex, where they lived until the end of their relationship. The other half was rented. During that period, both parties worked off and on; he was unemployed or disabled at various times and she missed substantial periods of work for medical reasons and to have a baby. (The child was born in 1973; defendant admitted paternity and agreed to help support the child.) During the cohabitation, defendant's total income seems to have been approximately twice that of plaintiff.[2] They maintained joint checking and savings accounts, from which "household" expenses were paid. It is not clear how much of their respective incomes the parties put in the joint accounts. There was evidence that for a time he maintained a separate account for property taxes, and she kept a separate "travel" account. The monthly payments on the duplex, with the exception of the first two, were paid from the joint checking account, and the rental payments made by the occupants of the other half of the duplex were also deposited in that account.

During their cohabitation, the parties also accumulated personal property, including automobiles and a motorcycle, furniture, appliances, tools, a handgun and other items. Defendant's name only was on the title to the automobiles. The circumstances under which most items of non-household personal property

---

[2] The record does not permit any precise determination of the parties' respective incomes. The only evidence was income tax returns for two of the years involved and extremely imprecise testimony about wages and other earnings and non-reportable, non-taxable income, such as workers' compensation and union benefits. The same sort of vagueness characterizes almost all the evidence about the parties' finances. For example, although the joint checking account bank statements were introduced and admitted, there was no testimony to identify the source of even one deposit in the whole period. The trial court found an implied partnership agreement, but how it was determined that the partnership was equal is wholly unexplained in the record.

[68]

were purchased and the manner of payment was not brought out at trial.[3] Some items were gifts from the parties' parents.

At various times during the 1972-77 period of cohabitation, plaintiff testified, she requested that defendant put her name on various titles, including the title to the duplex. He always refused. She also asked him several times to marry her, but he would not. He testified that he wished to avoid "the kinds of problems that would be incurred in a divorce suit if I married her." Nevertheless, she was hospitalized as Nancy Gorton on one occasion and the expenses were paid by his health insurer. She claimed that he told her that in case he died, all his property would go to her and the child.

In 1975, defendant mortgaged the duplex. He paid off the purchase contract and received approximately $8,000 net, of which he invested $4,000 in a business partnership. The remaining $4,000 was apparently applied on the mortgage or taxes on the duplex. In February, 1977, the parties separated. Defendant remained in the duplex—which at the time of trial was valued at about $50,000—and retained most of the

---

[3] There were exceptions. Defendant claimed that he paid for the stereo. Plaintiff said they both helped pay for it. The trial court apparently found plaintiff more credible on that point. We therefore consider the stereo among the household items purchased jointly.

Plaintiff purchased a Datsun automobile in 1971 at a time when she was not living with defendant. Her parents co-signed for the car. She claimed that when she quit working, for medical reasons, the title was transferred to him and he took over the payments. He testified that the title remained in both their names. He eventually sold it. Part of the proceeds of the sale were deposited in a joint account. The rest were used to buy a Ford truck in his name. For reasons which are not entirely clear on the record, her parents eventually paid a $3,000 judgment in connection with the loan on the car. What might be the parents' rights because of that payment are not determinable in this proceeding.

A race car, the value of which she estimated at over $3,000, was obtained in a trade for a retail musical record business in which defendant testified plaintiff had no interest. That was not disputed.

Defendant's testimony that he paid for the pistol with his separate funds was not contradicted.

[69]

personal property the parties had accumulated. He claimed that plaintiff owned no interest in any of it.

The trial court found that

"[p]laintiff has an interest in the [duplex] and the personal property acquired by the parties during the period of the living together from February, 1972 to February, 1977. This interest arises out of an implied agreement of partnership."

The court ordered the duplex sold and the proceeds distributed as follows: (1) $2,962, the amount of the down payment, to defendant together with interest from the date the property was purchased; (2) one-half the amount defendant borrowed on the property to plaintiff, with interest from the date of the refinancing; (3) $3,000 to plaintiff's parents, plus interest, from the date they paid the judgment taken against them as co-signers on the loan for the automobile originally purchased by plaintiff and later, according to plaintiff, signed over to defendant; and (4) the remaining proceeds in equal shares to plaintiff and defendant. The court ordered $3,750 deducted from defendant's share of the proceeds and paid to plaintiff in lieu of distribution of her share of the personal property. Defendant requested such a cash settlement provision, and plaintiff did not object.

■ We review *de novo.* We note, however, that nothing in the record discloses the plaintiff's theory beyond the assertion of unjust enrichment.[4] The case was decided on the basis of an implied partnership agreement, and that is the only theory urged by plaintiff in this court.

Some courts faced with the problem of dividing the assets acquired by parties during unmarried cohabitation have found an implied partnership agreement. In *re Estate of Thornton*, 81 Wash 2d 72, 499 P2d 864 (1972); *see Folberg and Buren*, Domestic Partnership: A Proposal for Dividing the Property of Unmarried

---

[4] Much of plaintiff's testimony consisted of her ideas of how particular items of personal property should be allocated between the parties, as if the case involved a property distribution in a dissolution of marriage case.

Families, 12 Will L J 453 (1976). In *Beal v. Beal*, 282 Or 115, 577 P2d 507 (1978), the leading Oregon case on the division of property between unmarried couples, the court noted the application of implied partnership agreements and other approaches by various courts. The court in *Beal* stated the law as follows:

> "We believe a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon.
> "* * * * *
> "More often than not, such an inquiry will produce convincing evidence of an intended division of property, but we recognize that occasionally the record will leave doubt as to the intent of the parties. In such cases, inferences can be drawn from factual settings in which the parties lived. Cohabitation itself can be relevant evidence of an agreement to share incomes during continued cohabitation. Additionally, joint acts of a financial nature can give rise to an inference that the parties intended to share equally. Such acts might include a joint checking account, a joint savings account, or joint purchases." 282 Or at 122.

■ ■ We conclude the record supports a finding of an implied intent to share equally in the household items, but does not support a finding of a mutual intent to share any interest in the duplex, the automobiles and motorcycle, or any other non-household item for which defendant paid with his own separate funds. There is no evidence of any expression by either party of an intention with respect to their relative interests in the household goods. The use of joint checking and savings accounts to purchase household items, the cohabitation itself and the conception and birth of the child, however, are persuasive evidence of an intent to share

[71]

equally in household items, whether purchased from a joint account or given to the parties while cohabiting. *Beal v. Beal, supra.* There was no evidence that defendant had a contrary intent until the parties separated.

■ On the other hand there were clear and repeated declarations, albeit by defendant unilaterally, but acknowledged by plaintiff on trial, of an intention with respect to the duplex and other personal property. He asserted throughout the relationship that he considered himself sole owner of those items. Plaintiff's repeated requests to be included in the title to various items were always refused, as were her suggestions of marriage. Defendant may have told plaintiff she would have an interest in case of his death, but there was no evidence that he led her to believe she had any interest in those items during his lifetime. Despite the joint accounts, the cohabitation and the child, the record does not support a finding of any agreement, *i.e.,* a mutual intention, to share the other property.

■ Defendant argues that the trial court erred in awarding some of the proceeds of the sale of the duplex to plaintiff's parents, who were not parties to this proceeding, because of their having paid off the loan on a car. We agree that no award could properly be made to the parents.[5]

The decree is therefore to be modified. The declaration that plaintiff has an interest in the duplex and the personal property, other than household goods, is eliminated. The order to sell the property and to distribute proceeds to plaintiff and her parents is also eliminated. It is decreed that plaintiff has a one-half interest in the household goods and furnishings. The value of that interest, based on plaintiff's estimates (which are the only available evidence), is $2,138. Because defendant has so requested and plaintiff has no objection, he may retain all the household furnish-

---

[5] *See* footnote 3, *supra.*

ings and compensate plaintiff in cash for her share of that property.

Affirmed as modified.

**BUTTLER, J.,** concurring in part, dissenting in part.

I agree with the majority that the record does not support an express agreement of the parties with respect to their relative interests in any of the property acquired during their final five year period of cohabitation. I also agree with the majority that the record supports a finding of an implied intent to share equally in the household items. In this connection, the majority states:

"* * *The use of joint checking and savings accounts to purchase household items, the cohabitation itself and the conception and birth of the child, however, are persuasive evidence of an intent to share equally in household items, whether purchased from a joint account or given to the parties while cohabiting. *Beal v. Beal, supra.* There was no evidence that defendant had a contrary intent until the parties separated." 41 Or App at 71-72.

I disagree, however, with the conclusion that plaintiff has no interest in the duplex, which was the parties' home, as well as an investment. Therefore, I dissent.

The trial court found in favor of plaintiff, although there were substantial discrepancies between her testimony and that of defendant. We should defer to the trial judge's advantage in evaluating conflicting testimony, *McCoy and McCoy*, 28 Or App 919, 562 P2d 207, 29 Or App 287, 563 P2d 738 (1977), but whether we do or not, my reading of the record leads to the same evaluation of it.

On that basis, it appears that prior to the parties' recohabitation in February, 1972, they had considered

acquiring a place to buy, because they had been living in an apartment rented by plaintiff. They were looking for something in the nature of a duplex, including, according to defendant, a house which could be converted. They did not find one before they separated in November of 1971.

Defendant said he began looking for a duplex before he and plaintiff reunited, and had negotiated an earnest money agreement prior to that time. Plaintiff said defendant had found one he thought was interesting, gave her a copy of the listing, and they both looked at it. The earnest money agreement was signed March 29, 1972, by defendant as buyer, "a single man," and he paid the initial down payment out of funds he received as disability compensation for an on-the-job injury. Plaintiff did not know until after closing that the real estate contract would be in defendant's name alone.

The parties made their home in the second floor portion of the duplex and rented the other half. They opened joint bank accounts—both checking and savings —and both put most, if not all, of their earnings, and the rental income in those accounts. Most of their bills, including payments on the duplex contract, were paid from the joint checking account until the property was refinanced in June of 1976. (More about that below.) While the contract payments varied (because the escrow fees changed from time to time), they were approximately $250 per month. Defendant would have us believe that the amount over and above the rental payments received and deposited in the checking account was insignificant—approximately $20 per month. However, the duplex was rented originally for $137.50 per month, then increased to $150 per month and later to $180 per month. It appears, therefore, that at least $70 per month more than the rental payments was necessary to make the contract payments—and all of it came from the joint account until the refinancing.

In June of 1976, defendant refinanced the duplex contract by taking out a mortgage loan, the proceeds of which were used to pay off the contract, after which there was a balance of about $8,000. Out of that balance, defendant put $4,000 into a business he and a friend were starting; the remaining sum was put into a savings account with the mortgage lender, a savings and loan association. While the record is not entirely clear, it appears that the funds in that account were used to make the monthly mortgage payments and pay the real property taxes on the duplex.

With respect to the rented portion of the duplex, plaintiff helped to maintain it by cleaning it and shampooing the rugs between tenants, helped to re-paint it, showed the unit to prospective new tenants, issue receipts for rent, etc.

The foregoing facts, in addition to those relied on by the majority to show an implied intent to share equally in the household items, are sufficient, though bare-ly, to support the conclusion that there was an implied partnership with respect to the duplex, which had a business purpose (*see* ORS 68.110) even though the overall arrangement of the parties did not. The only factor which detracts from that conclusion is that bare legal title was in defendant. However, the record makes it clear that defendant, a wrestler and black belt judo practitioner, was the dominant and dominat-ing partner. It appears that defendant did not intend that plaintiff have any rights in anything acquired by the parties during their cohabitation, whether pur-chased from their joint funds or not. Yet the majority is willing to find an implied intent to share equally in the household items, but not their home and only investment. His attitude, at least at trial, was that what was his was his, and what was hers was his. Anything which lent itself to having a document of title listed him as the sole owner. The most dramatic example of this is his insistence that title to a car purchased in plaintiff's name before their final period

of cohabitation be transferred to him after she became pregnant in 1973. Since he didn't want it, he sold it, leaving plaintiff's parents liable for the balance of the purchase price because they had cosigned the paper.

Here, the parties pooled their earnings in joint bank accounts and paid their bills, generally, from the joint checking account. Most, if not all, of plaintiff's earnings were spent on their joint expenses, and some of them went into the duplex. While legal title to everything to which a document of title was applicable was in defendant, in the context of the parties' arrangement that fact does not seem to have much real significance. He refused her request to put title in both of their names because he thought it might complicate things and because he said she and the child would get it if he died. How plaintiff would get any part of it, absent a will so providing, is not explained *unless* she had an interest by virtue of their arrangement. His intention, then, with respect to plaintiff's having an "interest" in the property, as opposed to his bare legal title, was ambivalent. One half of the duplex was their home, and she did all of the housework, laundry and cooking, even when she was working. The rental from the other half went into a joint account to which she had as much legal right as he—and in fact wrote most of the checks. The monthly contract payments were made from that account, at least until the refinancing in June, 1976. Thereafter, mortgage payments and taxes were made from an account established with funds derived from the mortgage loan on the property—in other words, the property itself was funding those payments.

While it is true that he earned more than she during the last five years of their relationship, the discrepancy is nowhere near as great as he contends. As best I can determine from the testimony, most of their earnings were deposited in one or the other of the joint accounts. No effort was made to keep segregated accounts of anything.

[76]

On these facts, I conclude that there was an implied partnership agreement between the parties with respect to the duplex. While it does not follow that it was a 50-50 partnership, given the fact that one-half of the duplex was their home, which she maintained for the benefit of the parties and their child, and that she put money and effort into the entire unit, it is not unreasonable to conclude that plaintiff is an equal owner.

Accordingly, I would affirm the decree as it relates to the disposition of the duplex, except that I agree with the majority that it must be modified to eliminate the requirement that defendant pay $3,000 to plaintiff's parents, whose rights are not involved in this proceeding. In all other respects I would affirm.

Thornton, Lee and Roberts, JJ., join in this dissent.