George W. BISHOP, Appellant,

v.

Stacey A. CLARK, Appellee.

No. S–9232.

Supreme Court of Alaska.

Sept. 13, 2002.

---

Claire Steffens, Law Offices of Claire Steffens, Anchorage, for Appellant.

Allan Beiswenger, Robinson & Beiswenger, Soldotna, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Was it error to award Stacey A. Clark a one-half interest in certain property accumulated while she cohabited with George W. (Will) Bishop? Because we hold that it was error to conclude that a settlement agreement the parties executed in 1998 superseded their 1996 agreement which allocated some of the disputed property to Will, we reverse and remand for consideration of Stacey's claim that she signed the 1996 agreement under duress. Because we affirm the finding that the parties impliedly agreed "to share in the fruits of [their] relationship as though they were married," we affirm Stacey's award of a one-half interest in property not allocated by the 1996 agreement.

## II. FACTS AND PROCEEDINGS

Stacey and Will began dating in 1979 and cohabited between 1983 and 1996, when they separated.[1] They never married. They had two children. One was born in 1989; the other was born in 1993.

In 1980 Will purchased a Bristol Bay setnet permit to fish for salmon at Coffee Point. Stacey worked that summer for Will as a deckhand and received a "crew share" of the proceeds. In 1981 Will transferred the setnet permit to Stacey and purchased a second permit; Will explained that this arrangement was necessary because AS 16.43.140(c) prohibits a person from holding more than one entry permit for the same fishery.[2] Between 1981 and 1995 the parties fished the permits as a joint enterprise. They testified at trial that they considered the Bristol Bay fishing enterprise to be a partnership. They sold fish under both permits, and they listed sales in either of their names based purely on convenience. Although Stacey declared for personal income tax purposes all the income generated from sales attributable to her permit, she gave Will all of the proceeds, except for an allowance she kept for personal expenses. Will was responsible for managing the finances of the fishing enterprise, and according to Stacey, she "worked right beside him, [doing] just as much as he did. [She] picked the fish, ... took the fish to the market, ... did the paperwork, ... did the cooking, the cleaning, [and] took care of the crew."

Will began lobster fishing in California in 1986. The extent of Stacey's participation in lobster fishing was disputed at trial. Stacey generally did not accompany Will on the lobster boat; rather, she baited traps, managed gear, obtained parts, and prepared lunches. In 1994 Will purchased a hull and put together a twenty-five-foot lobster boat for use in this fishery.

Will purchased a lot in 1990 in the Mountain View subdivision in Homer for $32,000. Although the lot was titled in Will's name, "[t]he proceeds used to pay for the lot came from the parties' commingled funds." The lot was sold for $42,000 in February 1996.

Will built a cabin on his sister's property on East Hill Road in Homer in 1994. Will and Stacey resided in the cabin whenever they were in Homer between 1994 and January 1996. Will and Stacey separated in January 1996. After they separated, Stacey continued to live in the cabin with her boyfriend/fiancee and her mother.

On June 7, 1996, the parties reached the following agreement:

To Whom it may concern:

---

1. During this period, however, Will and Stacey spent considerable time apart. For example, Stacey spent the winters in 1985 and 1986 in Everett, Washington. Will spent several months in 1994 and 1995 in California fishing for lobster without Stacey.

2. By transferring Bristol Bay setnet permits to "trusted friends or family members," Stacey and Will eventually acquired two additional permits, for a total of four.

This is a fair distribution of the *business assets based on the capital investments and contributions to this partnership.*
Stacey A. Clark is to keep all of her banking accounts, IRA accounts, 1990 Honda Accord automobile, Bristol Bay Setnet site and Bristol Bay Setnet Permit and Equipment necessary to operate said permit and site and any debts [incurred] as of this date.
*George W. Bishop is to keep* all of his banking accounts, IRA accounts, Bristol Bay Setnet site and Bristol Bay Setnet Permit and any equipment necessary to operate said permit and site, 1989 Chevy Blazer, 1989 GMC Pickup, *25 foot Force Boat, Lobster gear, House located mile .2 East Hill Road* and any debts [incurred] as of this date.

(Emphasis added.)

Stacey filed a complaint for property division, child custody, child support, and attorney's fees in November 1997. Will counterclaimed, seeking joint physical custody of the children.

A May 5, 1998 order required Will to pay interim child support of $1,362 per month and awarded Stacey interim attorney's fees of $2,500.

In June 1998 the parties entered into a second agreement. It was titled "PROPERTY SETTLEMENT AGREEMENT." We discuss its terms in more detail in Part III.A. The 1998 agreement stated that the parties had identified "additional property which each has claimed an interest in." Paragraphs 2, 3, and 4 of the agreement listed and distributed "additional items" to the parties. In paragraph 5 the parties agreed to give up all potential claims against each other for "all property other than as provided herein." Paragraph 6 stated that "this settlement resolves all property issues except" those concerning (1) the East Hill Road cabin; (2) "the personalty, furnishings and appliances" in the East Hill Road cabin; (3) the 1997 fishing season; (4) the "sale of a piece of real property after June 7, 1996"; (5) the

lobster boat; and (6) arrearages for interim child and spousal support. The superior court adopted this agreement on September 3, 1998.

In October 1998 the parties entered into a child custody agreement which the superior court adopted, as amended, on February 10, 1999.

The case proceeded to trial in February 1999. The trial was limited to the issues of distributing: the East Hill Road cabin, the furniture and appliances in the cabin, income from the 1997 fishing season, the Mountain View lot, and the lobster boat; and determining: child support arrearages, prospective child support, and the management of the children's permanent fund dividends.

Finding an "implicit agreement of the parties to live together indefinitely and to share in the fruits of that relationship as though they were married," the superior court awarded Stacey a one-half interest in the disputed property. The court also ordered Will to pay child support arrearages and calculated prospective child support based on an average of Will's 1995 and 1996 adjusted gross income.

Will unsuccessfully moved for reconsideration. The superior court entered final judgment for Stacey on July 19, 1999 for $81,942.17, including Alaska Civil Rule 82 attorney's fees of $9,001.44. Will appeals.

## III. DISCUSSION

### A. It Was Error To Conclude that the 1998 Settlement Agreement Superseded the 1996 Agreement as to the Disputed Property.

Finding an "implicit agreement of the parties to live together indefinitely and to share in the fruits of that relationship as though they were married," the superior court awarded Stacey a one-half interest in certain property accumulated during the time parties cohabited. Thus, Stacey received a one-half interest in (1) the East Hill Road cabin,[3]

---

**3.** Will built the East Hill Road cabin on property owned by his sister, Phyliss Bishop. The cabin was appraised at $35,000, independent of the underlying real estate. The superior court awarded the cabin to Will "because of the relationship with his sister," but ordered Will to pay Stacey "$17,500 representing her interest in the cabin."

(2) the furniture and appliances in the cabin, (3) the proceeds from the sale of the Mountain View lot, and (4) the lobster boat and lobster-fishing gear. Even though the 1996 settlement agreement allocated the East Hill Road cabin, the lobster boat, and the lobster-fishing gear to Will, the superior court awarded Stacey a one-half interest in these items. The superior court concluded that the 1998 agreement, which stated that it did not resolve issues concerning these items, superseded the 1996 agreement. Thus, the superior court stated: "[I]t seems clear to the court that the parties agreed that the issues identified in the 1998 agreement as unresolved were to be addressed by the court without reference to the 1996 agreement." Will challenges this conclusion.

 Whether the 1998 agreement superseded the 1996 agreement is a matter of contract interpretation to which we apply our independent judgment.[4]

 A leading treatise explains the conditions under which a subsequent contract will supersede an earlier agreement:

A subsequent contract completely covering the same subject-matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, substitutes, and is substituted for the earlier contract and becomes the only agreement of the parties on the subject.[5]

Thus, a second contract will not supersede the first by implication unless the agreements are so inconsistent "that the two cannot subsist together." [6]

We conclude that the 1998 settlement agreement did not supersede the 1996 agreement in whole or in part, because the two agreements are not so inconsistent "that the two cannot subsist together." [7] We note that the 1998 agreement characterizes the 1996 agreement as *allocating* certain properties between [the parties]." (Emphasis added.) Paragraph 1 of the 1998 agreement similarly states that the earlier agreement "allocates to each party the equipment necessary to operate their respective permits"; use of the present tense implies that the 1996 agreement was still in effect. Paragraph 1 also states that the 1996 agreement "is deemed to have allocated to Stacey" certain equipment necessary to operate her setnet site. This also suggests that the parties intended the earlier agreement to remain in effect, so that they could each continue to operate their respective permits and sites. Furthermore, the 1998 agreement states that "the parties have identified *additional property* which each has claimed an interest in." (Emphasis added.) The words "additional items" also appear in the three paragraphs (paragraphs 2, 3, and 4) of the 1998 settlement agreement which purport to allocate specific items. This usage implies that the parties did not intend to supersede the 1996 agreement, but rather intended to supplement that agree-

**4.** See *Key Pacific Mortgage, Inc. v. Indus. Indem. Co.*, 845 P.2d 1087, 1089 (Alaska 1993).

**5.** 15 Walter H.E. Jaeger, Williston on Contracts § 1826, at 485–86 n. 9 (3d ed.1972) (citation omitted); *see also id.* at 485 ("A contract containing a term in consistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.") (citation omitted); Restatement of Contracts § 408 (1932); *see also Juneau Educ. Assoc. v. City & Borough of Juneau*, 539 P.2d 704, 706 (Alaska 1975) (" '[I]t is a well settled principle of law that [a] later contract supersedes [a] former contract as to inconsistent provisions.' ") (quoting *NLRB v. Int'l Union of Operating Eng'rs, Local No. 12*, 323 F.2d 545, 548 (9th Cir.1963)). Because no court order adopted the 1996 agreement, the superior court correctly treated this as a supersession dispute. It is not clear whether the superior court found that the 1998 agreement completely or only partially superseded the 1996 agreement. The court's order stated that "[t]he court finds that the June 1996 agreement although incorporated in part by reference was superseded by the 1998 agreement." This finding suggests that the court considered the 1996 agreement to have no independent effect after the parties entered into the 1998 agreement. And the court decided that Stacey's argument that she signed the 1996 agreement under duress was irrelevant given its finding that the 1998 agreement superseded the 1996 agreement. In any event, the court resolved the four property disputes without referring to the 1996 agreement or relying on its terms.

**6.** *Willeke v. Bailey*, 144 Tex. 157, 189 S.W.2d 477, 479 (1945).

**7.** *Id.*

ment by addressing issues not resolved by that agreement. Finally, we note that the 1998 agreement fails to address many of the items which the 1996 agreement had previously allocated; this also suggests that the parties did not intend to supersede the earlier agreement.

True, paragraph 6 of the 1998 agreement provides that "[t]he parties agree this settlement resolves all property issues except" issues "concerning," among others, the East Hill Road cabin and the lobster boat. But this does not mean that the 1998 agreement is inconsistent with the 1996 agreement, which allocated the East Hill Road cabin and the lobster boat to Will. Simply acknowledging that the parties agree that issues exist does not mean that the parties are agreeing to set aside provisions in a prior contract that arguably resolved those issues. We therefore hold that it was error to conclude that the 1998 settlement agreement superseded the 1996 agreement.

■ Stacey argued in her trial brief that she signed the 1996 agreement under duress, "in large part due to physical abuse by Will."[8] Stacey presented evidence at trial that the parties had argued and shoved each other a day before they signed the agreement, and that she had not seen the agreement until just before she signed it. The superior court, however, made no findings regarding Stacey's duress claim, having noted that "whether the document was signed under duress is irrelevant because the court finds that it was superseded by the agreement of June 1998. . . ." Because we conclude that the 1998 agreement did not supersede the 1996 contract, we must remand for findings regarding duress. If the superior court concludes on remand that Stacey did not sign the 1996 agreement under duress, it must award the East Hill Road cabin, the lobster

boat, and the lobster-fishing gear to Will, per the terms of the 1996 agreement.[9] If the superior court concludes that Stacey signed the 1996 agreement under duress, the 1996 agreement would be void and should not control the ultimate property disposition.[10]

**B. It Was Not Error To Award Stacey a One Half Interest in the Disputed Property Not Allocated by the 1996 Agreement.**

**1. It was not error to find an implicit agreement between Will and Stacey to "share in the fruits of [their] relationship as though they were married."**

■ In granting Stacey a one-half interest in the disputed property, the superior court found an "implicit agreement of the parties to live together indefinitely and *to share in the fruits of that relationship as though they were married.*" (Emphasis added.) The court explained:

Here the parties co-habitated and worked together from 1979. They lived together, at least during the summers starting in 1980 when the first set net permit and site was purchased, until 1982 when plaintiff graduated from high school. Following graduation and until January of 1996 the parties resided together, worked together, vacationed together and gave birth to two children. Defendant kept the books, and was in charge of finances. Plaintiff worked alongside him until the children arrived and thereafter had no significant employment outside of the home.

We treat the court's decision as finding that these cohabiting parties impliedly agreed to the distribution of property accu-

8. In *D.M. v. D.A.*, 885 P.2d 94, 96 (Alaska 1994), the superior court voided a settlement agreement between cohabiting parties because it was signed under duress. "The finding of duress was based on a history of domestic violence between D.M. and D.A., including an incident two days prior to the signing of the contract." *Id.* at 96 n. 2. D.M. did not challenge that finding on appeal. *See id.*

9. On remand, the superior court may not redistribute the disputed property allocated by the

1996 settlement agreement. When the superior court distributes property accumulated during non-marital cohabitation, it "must determine the express or implied intent of the parties with respect to each item of property." *Lacher v. Lacher*, 993 P.2d 413, 421 n. 28 (Alaska 1999) (citing *Wood v. Collins*, 812 P.2d 951, 956 (Alaska 1991)).

10. *See Helstrom v. North Slope Borough*, 797 P.2d 1192, 1197 (Alaska 1990).

mulated during cohabitation. Will challenges this finding. We review it de novo.[11]

In *Wood v. Collins*, we held that "property accumulated during cohabitation should be divided by determining the express or implied intent of the parties."[12] Quoting *Beal v. Beal*, we stated:

> We believe a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon. In summary, we hold that courts, when dealing with the property disputes of a man and a woman who have been living together in a nonmarital domestic relationship, should distribute the property based upon the express or implied intent of those parties.[13]

■ In determining the intent of cohabiting parties, courts consider, among other factors, whether the parties have (1) made joint financial arrangements such as joint savings or checking accounts, or jointly titled property;[14] (2) filed joint tax returns;[15] (3) held themselves out as husband and wife;[16] (4) contributed to the payment of household expenses;[17] (5) contributed to the improvement and maintenance of the disputed property;[18] and (6) participated in a joint business venture.[19] Whether they have raised children together or incurred joint debts is also important.

Although it is a close question in this case, we conclude that the totality of circumstances supports the superior court's finding of an implied agreement between Will and Stacey "to share in the fruits of [their] relationship as though they were married." Both parties testified that they considered the Bristol Bay fishing enterprise to be a partnership. Will commingled income from the fishing partnership with his separate income by depositing the funds in his separate accounts; payments for the disputed property and other household expenses were made from those accounts. The parties also had joint checking and savings accounts, from which household expenses were paid. Finally, the parties had two children together. We therefore conclude that it was not error to award Stacey a one-half interest in the disputed property not allocated by the 1996 settlement agreement—i.e., the furniture and appliances in the East Hill Road cabin and the proceeds from the sale of the Mountain View lot.

**2. It was not error to conclude that issues regarding the division of the proceeds from the sale of the Mountain View lot were open to adjudication.**

■ Paragraph 5 of the 1998 settlement agreement provides that "[t]he parties agree that they give up all potential claims each against the other for all debts and all property other than as provided herein." Paragraph 6(d) of the 1998 agreement provides that the agreement does not resolve "issues pertaining to sale of a piece of real property *after June 7, 1996.*" (Emphasis added.)

**11.** *See Wood,* 812 P.2d at 955–56, 955 n. 4 ("Applying the law to a given set of facts is a question of law subject to de novo review.").

**12.** 812 P.2d 951, 956 (Alaska 1991) (citing *Beal v. Beal,* 282 Or. 115, 577 P.2d 507, 510 (1978) (en banc)).

**13.** *Wood,* 812 P.2d at 956 (quoting *Beal,* 577 P.2d at 510 (internal ellipses omitted)).

**14.** *See D.M.,* 885 P.2d at 98.

**15.** *See, e.g., Carroll v. Lee,* 148 Ariz. 10, 712 P.2d 923, 925 (1986).

**16.** *See, e.g., id.*

**17.** *See, e.g., Rissberger v. Gorton,* 41 Or.App. 65, 597 P.2d 366, 370 (1979).

**18.** *See, e.g., Beal,* 577 P.2d at 510.

**19.** *See, e.g., Western States Constr., Inc. v. Michoff,* 108 Nev. 931, 840 P.2d 1220, 1221–22 (1992).

Stacey argues that paragraph 6(d) refers to the sale of the Mountain View lot. Stacey asked the superior court to award her an interest in that lot's sale proceeds. Will responded, and maintains on appeal, that because the Mountain View lot was sold in February 1996, it is not the real property referred to in paragraph 6(d). Will therefore concludes that under paragraph 5 of the 1998 agreement, issues regarding the division of the proceeds from the sale of the lot are not open to adjudication.

The superior court, while noting that the Mountain View lot was sold in February 1996, stated that the 1998 agreement "was prepared by [Will] and he affords no explanation as to what is the real property referred to at that point in the agreement." The court therefore awarded Stacey a one-half interest in the Mountain View lot sale proceeds.

▮▮ Because the superior court interpreted paragraph 6(d) of the 1998 settlement agreement to apply to the sale of the Mountain View lot—an interpretation contrary to the language of the agreement—the court essentially reformed the 1998 agreement. "Reformation of an instrument is the proper remedy where it is alleged that the instrument does not conform to the actual intentions of the parties."[20] It is a "means of correcting mutual mistakes and of conforming a contract to the clear intention of the parties."[21] Reformation may be granted, however, "only when it is shown by clear and convincing evidence that it is appropriate."[22]

It does not appear that the superior court applied the clear and convincing evidence standard in reforming the parties' agreement. But even if it had applied that proof standard, it is difficult to imagine how it could have reached a different result. There is no evidence in the record of any other property which paragraph 6(d) of the 1998 agreement could have been describing. Will's argument would render the provision

completely meaningless. Although he insists that paragraph 6(d) does·not contemplate the sale of the Mountain View lot, he has provided no alternative explanation for the provision and has identified no other property to which paragraph 6(d) might have referred. Therefore, we hold, as a matter of law, that paragraph 6(d) refers to the sale of the Mountain View lot. Accordingly, issues regarding the division of proceeds from the sale of that lot were open to adjudication. The superior court therefore permissibly chose to divide those proceeds.

### 3. It was harmless error to apply divorce law to divide the parties' property.

In dividing the parties' property, the superior court applied "the same body of law that would be applied in resolving a property dispute between parties seeking a divorce." The court stated that it "[saw] no reason not to look to factors A through I enumerated in AS 25.24.160(a)(4) [the statutory provision governing division of property in a divorce action]."

▮▮▮ It was error to apply divorce law to divide the parties' property. In *Sugg v. Morris*, we held that "the equitable principles which apply to the judicial division of marital property of a man and woman who had been living together in lawful wedlock or in a bona fide putative marriage are not applicable where the man and woman have been knowingly living in a [non-marital] relationship ...."[23] Moreover, AS 25.24.160(a) applies by its terms only to "action[s] for divorce or action[s] declaring a marriage void ...." As we noted above in Part III.B.1, the property the couple accumulated must be divided in accordance with their intentions.

But because the superior court would have reached the same result without relying on divorce law, the error was harmless. Its July 20, 1999 order noted that "whether the

---

**20.** *D.M.*, 885 P.2d at 96.

**21.** *Oaksmith v. Brusich*, 774 P.2d 191, 197 (Alaska 1989).

**22.** See *D.M.*, 885 P.2d at 97; *see also Ahwinona v. State*, 922 P.2d 884, 887 (Alaska 1996) (hold-

ing party wishing to reform contract bears burden of establishing through clear and convincing evidence that omission was mutual mistake) (citation omitted).

**23.** 392 P.2d 313, 316 (Alaska 1964).

interests of the parties are determined through applications of the factors enumerated in AS 25.24.160(a)(4) or the principles of partnership law where the relative contributions of the parties cannot be determined and the partners co-habit, the results are the same. The property should be divided equally." Because the superior court found elsewhere that the parties agreed to "share in the fruits" of their long-term relationship, it would have divided equally the property accumulated during the period of the parties' cohabitation even had it not relied on divorce law.

## C. Other Issues

### 1. Separate property

■ Will argued below that he purchased the Mountain View lot and the furniture and appliances in the East Hill Road cabin with funds from a $200,000 inheritance he received after his father's death in 1984. The superior court declined to award these items to Will as his "separate property." It reasoned that "it is almost impossible for this court to track the use of defendant's inheritance and he made little effort to do so during trial." It also noted that "[a]ll monies earned or inherited by the couple were co-mingled ...." Finally, it stated that "given the nature of the [parties'] relationship, the court finds that it was [Will's] intention to gift a share of the inheritance to [Stacey] as it was expended."

■ Will argues on appeal that it was error to award Stacey an interest in property purchased with funds from his inheritance. Assuming without deciding that the concept of "separate property" applies to the division of property accumulated during cohabitation, a party arguing that assets were purchased with separate funds has the burden of proving the source of the funds.[24] Because Will admitted at trial that he commingled the proceeds from the Bristol Bay fishing enter-

prise with his inheritance, and because he offered no evidence at trial tracing the source of the funds he used to purchase the disputed property, we affirm the award to Stacey of an interest in property allegedly purchased with the inheritance.

### 2. Jurisdiction

■ Will argues that the superior court lacked jurisdiction to determine Stacey's interest in the East Hill Road cabin, because Will's sister, Phyliss Bishop, on whose property the cabin was built, was not joined as an indispensable party. Will cites *Silvers v. Silvers*, where we stated that " '[a]s a general rule, an owner of property must be joined as an indispensable party in any action that may adversely affect her interest in the property.' "[25] The superior court's award did not purport to affect Phyliss Bishop's interest in the East Hill Road property. It merely awarded Stacey one-half of the value of the cabin "independent of the underlying real estate." In effect, the court was simply dividing the interest which Will elsewhere asserted was his. We perceive no jurisdictional error.

### 3. Interim attorney's fees

■■ The superior court awarded Stacey interim attorney's fees of $2,500, without citing legal authority for the award. Will argues that there was no permissible basis for this award. This argument lacks merit. We have held that in actions between unmarried couples that resemble divorce proceedings the rules governing the award of attorney's fees in divorce cases will be applied.[26] When the court awarded interim attorney's fees, the present case closely resembled a divorce action, given the short period of time between the breakup of the parties' relationship and the filing of the action and the fact that property division, child custody, and

---

24. See *Zimin v. Zimin*, 837 P.2d 118, 122 (Alaska 1992) ("It is the duty of the parties ... to ensure that all necessary evidence is before the court in divorce proceedings."); *cf. Coffland v. Coffland*, 4 P.3d 317, 321–22 (Alaska 2000) (affirming trial court's determination that husband failed to show sufficient evidence of marital debt).

25. 999 P.2d 786, 792 (Alaska 2000) (quoting *B.B.P. Corp. v. Carroll*, 760 P.2d 519, 525 (Alaska 1988)).

26. *Bergstrom v. Lindback*, 779 P.2d 1235, 1238 (Alaska 1989); *see also Sanders v. Barth*, 12 P.3d 766, 768–69 (Alaska 2000) (explaining rule).

child support issues were in dispute. Because courts have the authority to enter interim awards of attorney's fees in divorce litigation, such authority also applies to cases, like this one, that closely resemble divorce litigation. As we stated in *Sanders v. Barth*, "[the rule concerning attorney's fees in divorces] should be reserved for cases that closely resemble divorce actions and for cases that involve disputes—such as disputes about custody or the initial division of property—for which it is of paramount importance that the parties be able to litigate on a 'fairly equal plain.'"[27] Based on *Bergstrom* and *Sanders*, we conclude that the superior court had inherent authority to award interim fees. We also hold that it did not abuse its discretion in doing so.

### 4. Rule 82 attorney's fees

The superior court's July 19, 1999 judgment included an Alaska Civil Rule 82 attorney's fees award of $9,001.44 to Stacey. The award was calculated under Rule 82 based on the value of the property awarded to Stacey. Will argues on appeal that it was an abuse of discretion to award attorney's fees under Rule 82, rather than under the divorce case standard, which takes into account the parties' relative economic circumstances.

Will's argument is not well taken. We have held that in a dispute between unmarried individuals limited to the issues of child custody and support, attorney's fees and costs should be governed by the standard used in divorce actions; that standard considers the parties' relative economic circumstances.[28] But in property disputes between unmarried cohabitants, we have upheld attorney's fees awards under Rule 82.[29] It was not an abuse of discretion to award Stacey attorney's fees under Rule 82 based on the value of the property awarded to her.

### 5. Interim child support

On May 5, 1998 the superior court ordered Will to pay interim child support of $1,362.00 per month, retroactive to December 1, 1997. Will appeals this award, arguing that the superior court erred (1) by awarding interim child support without properly determining child custody; and (2) by not basing the award on the actual percentage of time the children were with each parent.

Will first contends that the superior court violated his due process rights by failing to hold a hearing to determine the children's bests interests before awarding Stacey primary interim physical custody. But Will did not request a hearing until after the superior court entered its May 5, 1998 order; by then the court had already reviewed Stacey's motion for interim relief, Will's opposition, and Stacey's reply. Furthermore, Will does not claim any adverse effect causally related to the lack of hearing. In contrast, Will's authority for this contention consists of cases presenting much more significant due process concerns than any alleged deprivation here.[30] We therefore decline to reverse the interim child support order on this ground.

Will next argues that although the superior court's interim custody order awarded primary physical custody of the children to Stacey, Will had physical custody of the children forty-three percent of the time in the period before the parties reached a custody agreement. Will argues that it was therefore error not to calculate the interim child support under the shared-physical-custody formula set out in Alaska Civil Rule 90.3(b).

We have consistently held that child support awards should be based on the court's custody or visitation order rather than on the

---

**27.** 12 P.3d 766, 769 (Alaska 2000).

**28.** *See Bergstrom*, 779 P.2d at 1238.

**29.** *See Wood*, 812 P.2d at 957; *Levar v. Elkins*, 604 P.2d 602, 604 (Alaska 1980).

**30.** For example, in *Cushing v. Painter*, 666 P.2d 1044, 1046 (Alaska 1983), we held that the mother was deprived of due process where the superi-

or court scheduled an expedited hearing solely to determine the child's school placement for the upcoming year, but spontaneously and without notice transformed the proceeding into one that decided the issue of permanent custody. We further noted that the mother's lack of notice adversely affected her ability to adequately present her case. *Id.*

parties' actual custody arrangement.[31] We therefore affirm the interim child support award of $1,361 per month because it was based on the superior court's May 5, 1998 interim award of the childrens' primary physical custody to Stacey. But because the May 5, 1998 interim custody award was made retroactive to December 1, 1997, and there was no previous child custody order before the May order was entered, we reverse and remand for recalculation of the child support due based on the parties' actual custody arrangement for periods before May 5, 1998.

### 6. Prospective child support

 The superior court's June 1999 decision stated that "[f]or purposes of calculating [prospective] child support payments, the court will average [Will's] 1995 and 1996 reported adjusted gross income." Will argues that it was an abuse of discretion to base the prospective child support award on his 1995 income, because his "income in 1995 was [aberrantly] high, due to a record salmon return." Moreover, Will contends that the superior court failed to consider that the Bristol Bay fishery had collapsed in 1997.

 The superior court's June 1999 decision specifically acknowledged the "recent low salmon runs experienced in Bristol Bay." But given "strong evidence that losses or expenses from the operation of [Will's] business during 1997 were attributed to [Will] resulting in a negative adjusted gross income, while income from the same operation was attributed to his wife," the superior court decided to calculate Will's child support obligation by averaging his 1995 and 1996 reported adjusted gross income. Because the record contains adequate evidence of what the court called Will's "creative bookkeeping," we hold that the superior court did

not abuse its discretion in choosing to base the prospective child support award on an average of Will's 1995 and 1996 adjusted gross income.[32]

### IV. CONCLUSION

Because it was error to conclude that the 1998 settlement agreement superseded the 1996 agreement, we REVERSE and REMAND for a determination whether the 1996 agreement was signed under duress. We AFFIRM the superior court's finding of an implied agreement between the parties "to share in the fruits of [their] relationship as though they were married," and therefore AFFIRM the award to Stacey of a one-half interest in the property not distributed by the 1996 agreement. We REMAND for recalculation of the interim child support to be awarded for the period December 1, 1997 to May 5, 1998. We otherwise AFFIRM the child support award. We AFFIRM the attorney's fees awards.

FABE, Chief Justice, with whom MATTHEWS, Justice, joins, concurring in part and dissenting in part.

FABE, Chief Justice, with whom MATTHEWS, Justice, joins, concurring in part and dissenting in part.

Although I agree with most aspects of the court's opinion, I disagree with Part III.A and its conclusion that the trial court erred in finding that the June 1998 settlement agreement superseded certain terms of the 1996 agreement. The court's opinion relies on a 1945 Texas case concerning total substitution of one contract for another and concludes that the 1996 and 1998 agreements in this case "are not so inconsistent 'that the two cannot subsist together.'"[1] What the court's opinion fails to recognize, however, is that

---

**31.** *See Bennett v. Bennett,* 6 P.3d 724, 727 (Alaska 2000); *Turinsky v. Long,* 910 P.2d 590, 595 (Alaska 1996).

**32.** Will asserts that in calculating child support the superior court failed to include in Stacey's income rental payments of $550 Stacey received monthly. We do not reach this issue because Will does not adequately brief it. He does not discuss the issue in the argument portion of his opening brief; he mentions the failure to include the rent only in passing in his statement of the

case; and he addresses the issue in only one sentence in the argument portion of his reply brief. We therefore consider the issue waived. *Shearer v. Mundt,* 36 P.3d 1196, 1199 (Alaska 2001) (stating that generally "issues not briefed or only cursorily briefed are considered waived").

**1.** Slip Opinion at ―― (citing *Willeke v. Bailey,* 144 Tex. 157, 189 S.W.2d 477, 479 (1945)).

the 1998 agreement was not intended to rescind the entire 1996 agreement and thus only partially superseded the earlier agreement.

Where parties to a contract make an agreement of "partial recision," under which they agree to discharge some, but not all, of their duties of performance under the original contract, that agreement is treated as a modification of the original contract, rather than a complete recision. "An attempt to make an agreement of 'partial recision' that would discharge less than all of [the parties'] remaining duties under the existing contract is considered a modification ... and not an agreement of recision."[2] And when the parties agree to a new contract that modifies some terms of their original contract, "the terms of the new contract are found partly in the original contract and partly in the modifying contract."[3] Thus, a new contract, which contains a term that is inconsistent with the term of an earlier contract, "is interpreted as including an agreement to rescind the inconsistent term in the earlier contract."[4] This modification of discrete terms of the original contract does not require an agreement to rescind the entire original contract: "The parties may *or may not* at the same time agree to rescind all of the other provisions of the earlier contract. *The extent of the substitution is a matter of their intent.*"[5]

Although the court's opinion appears to recognize these black letter principles, it ignores the fact that Stacey and Will did not intend to rescind the entire 1996 contract—they intended only to modify certain provisions of the 1996 agreement. Indeed, in the 1998 agreement the parties recognized and reaffirmed most aspects of the property distribution of the 1996 agreement, modifying it only as to the East Hill Road cabin with its furnishings and appliances, and the lobster boat with its gear. While the 1996 agreement purported to accomplish a final distribution of all of the parties' property, including the cabin and its furnishings and the boat and its gear, the 1998 agreement modified the earlier agreement by leaving the resolution and distribution of these specific items of property up to the court. Thus, the 1998 agreement modified the contract and rescinded the original contract's terms as to those items of property.

Whether Stacey and Will intended to modify certain aspects of their original agreement presents a question of fact. The trial court found that Stacey and Will intended to have the court decide the distribution of certain items of property that were originally covered by the 1996 agreement. "[I]t seems clear ... that the parties agreed that the issues identified in the 1998 agreement as unresolved were to be addressed by the court without reference to the 1996 agreement." This finding regarding Stacey and Will's intent is amply supported by the context in which the 1998 agreement was entered.

The parties were in the process of litigating the effect and validity of the 1996 agreement when they entered into the 1998 settlement agreement. This fact alone lends strong support to the trial court's conclusion that the parties decided to reaffirm the resolution of some property issues, leaving the remainder to the court to decide. When Will filed his answer to Stacey's complaint, he alleged in a counterclaim that the parties had resolved all interests in their informal partnership by the 1996 contract. Stacey's answer to the counterclaim disputed this assertion. It was only after Stacey and Will understood that there was a contest as to the validity of the 1996 agreement and were proceeding with their pending lawsuit that they entered the new settlement agreement in June of 1998. Will's acquiescence in the 1998 settlement agreement to leaving certain property items open for resolution by the court was contrary to his earlier pleadings and position that Stacey's claims were barred by the 1996 agreement. Moreover, Will drafted the 1998 agreement. If it was

---

**2.** RESTATEMENT (SECOND) OF CONTRACTS § 283 cmt. b, at 391 (1981).

**3.** RESTATEMENT (SECOND) OF CONTRACTS § 149 cmt. a, at 374 (1981).

**4.** 15 Walter H.E. Jaeger, WILLISTON ON CONTRACTS § 1826, at 485 (1972).

**5.** *Id.* at 485–86 (emphasis added).

his view that disposition of the lobster boat and gear and the East Hill Road cabin and furnishings were conclusively resolved by the 1996 agreement, he could easily have stated that those items remained covered by the terms of the original agreement.

For these reasons, I would affirm the superior court's finding that the 1998 agreement modified the 1996 agreement on the issues of distribution of the East Hill Road cabin, its furnishings, the lobster boat, and gear. Moreover, I would affirm the superior court's distribution of those items of property. Therefore, I respectfully dissent.